# TSC INDUSTRIES, INC., ET AL. *v.* NORTHWAY, INC.

No. 74–1471.   Argued March 3, 1976—Decided June 14, 1976

MARSHALL, J., delivered the opinion of the Court, in which all Members joined except STEVENS, J., who took no part in the consideration or decision of the case.

*Joseph N. Morency, Jr.,* argued the cause for petitioners. With him on the briefs were *James T. Otis,*

*Wesley S. Walton, Milton V. Freeman,* and *Werner J. Kronstein.*

*Harry B. Reese* argued the cause for respondent. With him on the brief were *Arnold I. Shure, Stanley B. Block, Willard J. Lassers, Charles R. Kaufman,* and *Alex Elson.**

MR. JUSTICE MARSHALL delivered the opinion of the Court.

The proxy rules promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934 bar the use of proxy statements that are false or misleading with respect to the presentation or omission of material facts. We are called upon to consider the definition of a material fact under those rules, and the appropriateness of resolving the question of materiality by summary judgment in this case.

## I

The dispute in this case centers on the acquisition of petitioner TSC Industries, Inc., by petitioner National Industries, Inc. In February 1969 National acquired 34% of TSC's voting securities by purchase from Charles E. Schmidt and his family. Schmidt, who had been TSC's founder and principal shareholder, promptly resigned along with his son from TSC's board of directors. Thereafter, five National nominees were placed on TSC's board; and Stanley R. Yarmuth, National's president and chief executive officer, became chairman of the TSC board, and Charles F. Simonelli, National's executive vice president, became chairman of the TSC executive committee. On October 16, 1969, the TSC board, with

---

*\*Solicitor General Bork* and *David Ferber* filed a brief for the Securities and Exchange Commission as *amicus curiae* urging affirmance.

the attending National nominees abstaining, approved a proposal to liquidate and sell all of TSC's assets to National. The proposal in substance provided for the exchange of TSC common and Series 1 preferred stock for National Series B preferred stock and warrants.[1] On November 12, 1969, TSC and National issued a joint proxy statement to their shareholders, recommending approval of the proposal. The proxy solicitation was successful, TSC was placed in liquidation and dissolution, and the exchange of shares was effected.

This is an action brought by respondent Northway, a TSC shareholder, against TSC and National, claiming that their joint proxy statement was incomplete and materially misleading in violation of § 14 (a) of the Securities Exchange Act of 1934, 48 Stat. 895, 15 U. S. C. § 78n (a),[2] and Rules 14a-3 and 14a-9, 17 CFR §§ 240.14a-3, 240.14a-9 (1975), promulgated thereunder.[3] The basis

---

[1] Each share of TSC common stock brought .5 share of National Series B preferred stock and 1½ National warrants. Each share of TSC Series 1 preferred stock brought .6 share of National Series B preferred stock and one National warrant. National Series B preferred stock is convertible into .75 share of National common stock. A National warrant entitles the holder to purchase one share of National common stock at a fixed price until October 1978.

[2] Section 14 (a) provides:

"It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."

[3] Northway also alleged in its complaint that National pursued a fraudulent plan to acquire TSC for less than its fair value in violation of § 10 (b) of the Securities Exchange Act, 15 U. S. C. § 78j (b),

of Northway's claim under Rule 14a–3 is that TSC and National failed to state in the proxy statement that the transfer of the Schmidt interests in TSC to National had given National control of TSC.[4] The Rule 14a–9 claim, insofar as it concerns us,[5] is that TSC and National omitted from the proxy statement material facts relating to the degree of National's control over TSC

and Rule 10b–5, 17 CFR § 240.10b–5 (1975), promulgated thereunder. Northway has not pursued this claim in the proceedings that we are called upon to review. Northway also brought suit against Charles Schmidt and his family, charging them with aiding and abetting the corporate defendants in violation of § 10 (b) and Rule 10b–5. The District Court granted summary judgment to the Schmidt defendants, and the Court of Appeals affirmed. That aspect of the original suit is not before us.

[4] Rule 14a–3 (a) provides:

"No solicitation subject to this regulation shall be made unless each person solicited is concurrently furnished or has previously been furnished with a written proxy statement containing the information specified in Schedule 14A."

Schedule 14A, Item 5 (e), requires:

"If to the knowledge of the persons on whose behalf the solicitation is made a change in control of the issuer has occurred since the beginning of its last fiscal year, state the name of the person or persons who acquired such control, the basis of such control, the date and a description of the transaction or transactions in which control was acquired and the percentage of voting securities of the issuer now owned by such person or persons." 17 CFR § 240.14a–101, Item 5 (e) (1975).

[5] Northway also asserted a claim under Rule 14a–9 that the proxy statement was materially misleading in its assertion that the TSC board of directors had approved the proposed transaction. It contended, first, that the proposal was never legally approved under applicable state law; and, second, that the statement should have in any event disclosed that the proposal received only four affirmative votes, and that the National nominees were cautioned against voting by their legal advisers. The Court of Appeals did not reach the first contention, and it found summary judgment inappropriate on the second. Neither contention is before us.

and the favorability of the terms of the proposal to TSC shareholders.[6]

Northway filed its complaint in the United States District Court for the Northern District of Illinois on December 4, 1969, the day before the shareholder meeting on the proposed transaction, but while it requested injunctive relief it never so moved. In 1972 Northway amended its complaint to seek money damages, restitution, and other equitable relief. Shortly thereafter, Northway moved for summary judgment on the issue of TSC's and National's liability. The District Court denied the motion, but granted leave to appeal pursuant to 28 U. S. C. § 1292 (b). The Court of Appeals for the Seventh Circuit agreed with the District Court that there existed a genuine issue of fact as to whether National's acquisition of the Schmidt interests in TSC had resulted in a change of control, and that summary judgment was therefore inappropriate on the Rule 14a–3 claim. But the Court of Appeals reversed the District Court's denial of summary judgment to Northway on its Rule 14a–9 claims, holding that certain omissions of fact were material as a matter of law. 512 F. 2d 324 (1975).

We granted certiorari because the standard applied by the Court of Appeals in resolving the question of materiality appeared to conflict with the standard applied by other Courts of Appeals. 423 U. S. 820 (1975).

---

[6] Rule 14a–9 (a) provides:

"No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."

We now hold that the Court of Appeals erred in ordering that partial summary judgment be granted to Northway.

## II

### A

As we have noted on more than one occasion, § 14 (a) of the Securities Exchange Act "was intended to promote 'the free exercise of the voting rights of stockholders' by ensuring that proxies would be solicited with 'explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought.'" *Mills* v. *Electric Auto-Lite Co.,* 396 U. S. 375, 381 (1970), quoting H. R. Rep. No. 1383, 73d Cong., 2d Sess., 14 (1934); S. Rep. No. 792, 73d Cong., 2d Sess., 12 (1934). See also *J. I. Case Co.* v. *Borak,* 377 U. S. 426, 431 (1964). In *Borak,* the Court held that § 14 (a)'s broad remedial purposes required recognition under § 27 of the Securities Exchange Act, 15 U. S. C. § 78aa, of an implied private right of action for violations of the provision. And in *Mills,* we attempted to clarify to some extent the elements of a private cause of action for violation of § 14 (a). In a suit challenging the sufficiency under § 14 (a) and Rule 14a–9 of a proxy statement soliciting votes in favor of a merger, we held that there was no need to demonstrate that the alleged defect in the proxy statement actually had a decisive effect on the voting. So long as the misstatement or omission was material, the causal relation between violation and injury is sufficiently established, we concluded, if "the proxy solicitation itself . . . was an essential link in the accomplishment of the transaction." 396 U. S., at 385. After *Mills,* then, the content given to the notion of materiality assumes heightened significance.[7]

---

[7] Our cases have not considered, and we have no occasion in this case to consider, what showing of culpability is required to establish the liability under § 14 (a) of a corporation issuing a materially

## B

The question of materiality, it is universally agreed, is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor. Variations in the formulation of a general test of materiality occur in the articulation of just how significant a fact must be or, put another way, how certain it must be that the fact would affect a reasonable investor's judgment.

The Court of Appeals in this case concluded that material facts include "all facts which a reasonable shareholder *might* consider important." 512 F. 2d, at 330 (emphasis added). This formulation of the test of materiality has been explicitly rejected by at least two courts as setting too low a threshold for the imposition of liability under Rule 14a–9. *Gerstle* v. *Gamble-Skogmo, Inc.*, 478 F. 2d 1281, 1301–1302 (CA2 1973); *Smallwood* v. *Pearl Brewing Co.*, 489 F. 2d 579, 603–604 (CA5 1974). In these cases, panels of the Second and Fifth Circuits opted for the conventional tort test of materiality—whether a reasonable man *would* attach importance to the fact misrepresented or omitted in determining his course of action. See Restatement (Second) of Torts § 538 (2) (a) (Tent. Draft No. 10, Apr. 20, 1964). See also American Law Institute, Federal Securities Code § 256 (a) (Tent. Draft No. 2, 1973).[8] *Gerstle*

---

misleading proxy statement, or of a person involved in the preparation of a materially misleading proxy statement. See *Gerstle* v. *Gamble-Skogmo, Inc.*, 478 F. 2d 1281, 1298–1301 (CA2 1973); *Richland* v. *Crandall*, 262 F. Supp. 538, 553 n. 12 (SDNY 1967); R. Jennings & H. Marsh, Securities Regulation: Cases and Materials 1358–1359 (3d ed. 1972). See also *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185, 209 n. 28 (1976).

[8] This standard, or a close approximation, has been widely recited in cases involving various sections of the securities laws. See, *e. g.*, *Chris-Craft Industries, Inc.* v. *Piper Aircraft Corp.*, 480 F. 2d 341,

v. *Gamble-Skogmo, supra,* at 1302, also approved the following standard, which had been formulated with reference to statements issued in a contested election: "whether, taking a properly realistic view, there is a substantial likelihood that the misstatement or omission may have led a stockholder to grant a proxy to the solicitor or to withhold one from the other side, whereas in the absence of this he would have taken a contrary course." *General Time Corp.* v. *Talley Industries, Inc.,* 403 F. 2d 159, 162 (CA2 1968), cert. denied, 393 U. S. 1026 (1969).

In arriving at its broad definition of a material fact as one that a reasonable shareholder *might* consider important, the Court of Appeals in this case relied heavily upon language of this Court in *Mills* v. *Electric Auto-Lite Co., supra.* That reliance was misplaced. The *Mills* Court did characterize a determination of materiality as at least "embod[ying] a conclusion that the

363 (CA2 1973) (§ 14 (e)); *John R. Lewis, Inc.* v. *Newman,* 446 F. 2d 800, 804 (CA5 1971) (§ 10 (b)); *Gilbert* v. *Nixon,* 429 F. 2d 348, 355–356 (CA10 1970) (§ 10 (b) of the Securities Exchange Act and § 12 (2) of the Securities Act of 1933, 15 U. S. C. § 78*l*); *Rogen* v. *Ilikon Corp.,* 361 F. 2d 260, 266 (CA1 1966) (§ 10 (b)); *SEC* v. *Texas Gulf Sulphur Co.,* 401 F. 2d 833, 849 (CA2 1968), cert. denied *sub nom. Coates* v. *SEC,* 394 U. S. 976 (1969) (§ 10 (b)); *List* v. *Fashion Park, Inc.,* 340 F. 2d 457, 462 (CA2), cert. denied *sub nom. List* v. *Lerner,* 382 U. S. 811 (1965) (§ 10 (b)); *Kohler* v. *Kohler Co.,* 319 F. 2d 634, 642 (CA7 1963) (§ 10 (b)). But see *Sonesta Int'l Hotels Corp.* v. *Wellington Associates,* 483 F. 2d 247, 251 (CA2 1973). In several of these cases, the courts have also defined materiality to encompass those facts "which in reasonable and objective contemplation might affect the value" of the securities involved. *Rogen* v. *Ilikon, supra; SEC* v. *Texas Gulf Sulphur, supra; List* v. *Fashion Park, Inc., supra; Kohler* v. *Kohler Co., supra.* The standard adopted by the Court of Appeals in this case has been applied in *Kohn* v. *American Metal Climax, Inc.,* 458 F. 2d 255, 269 (CA3 1972) (§ 10 (b)), and *Ronson Corp.* v. *Liquifin Aktiengesellschaft,* 483 F. 2d 846, 851 (CA3 1973) (§ 14 (e)).

defect was of such a character that it might have been considered important by a reasonable shareholder who was in the process of deciding how to vote." 396 U. S., at 384. But if any language in *Mills* is to be read as suggesting a general notion of materiality, it can only be the opinion's subsequent reference to materiality as a "requirement that the defect have a significant *propensity* to affect the voting process." *Ibid.* (Emphasis in original.) For it was that requirement that the Court said "adequately serves the purpose of ensuring that a cause of action cannot be established by proof of a defect so trivial, or so unrelated to the transaction for which approval is sought, that correction of the defect or imposition of liability would not further the interests protected by § 14 (a)." *Ibid.* Even this language must be read, however, with appreciation that the Court specifically declined to consider the materiality of the omissions in *Mills*. *Id.*, at 381 n. 4. The references to materiality were simply preliminary to our consideration of the sole question in the case—whether proof of the materiality of an omission from a proxy statement must be supplemented by a showing that the defect actually caused the outcome of the vote. It is clear, then, that *Mills* did not intend to foreclose further inquiry into the meaning of materiality under Rule 14a–9.[9]

---

[9] Nor is *Affiliated Ute Citizens* v. *United States,* 406 U. S. 128 (1972), also relied upon by the Court of Appeals, dispositive. There we held that when a Rule 10b–5 violation involves a failure to disclose, "positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." *Id.*, at 153–154. The conclusion embodied in the quoted language was simply that positive proof of reliance is unnecessary when materiality is established, and in order to reach that conclusion it was not necessary to articulate a precise definition of materiality, but only to give a "sense" of the notion. The quoted language did not purport to do more.

## C

In formulating a standard of materiality under Rule 14a–9, we are guided, of course, by the recognition in *Borak* and *Mills* of the Rule's broad remedial purpose. That purpose is not merely to ensure by judicial means that the transaction, when judged by its real terms, is fair and otherwise adequate, but to ensure disclosures by corporate management in order to enable the shareholders to make an informed choice. See *Mills*, 396 U. S., at 381. As an abstract proposition, the most desirable role for a court in a suit of this sort, coming after the consummation of the proposed transaction, would perhaps be to determine whether in fact the proposal would have been favored by the shareholders and consummated in the absence of any misstatement or omission. But as we recognized in *Mills, supra,* at 382 n. 5, such matters are not subject to determination with certainty. Doubts as to the critical nature of information misstated or omitted will be commonplace. And particularly in view of the prophylactic purpose of the Rule and the fact that the content of the proxy statement is within management's control, it is appropriate that these doubts be resolved in favor of those the statute is designed to protect. *Mills, supra,* at 385.

We are aware, however, that the disclosure policy embodied in the proxy regulations is not without limit. See *id.,* at 384. Some information is of such dubious significance that insistence on its disclosure may accomplish more harm than good. The potential liability for a Rule 14a–9 violation can be great indeed, and if the standard of materiality is unnecessarily low, not only may the corporation and its management be subjected to liability for insignificant omissions or misstatements, but also management's fear of exposing itself to substantial liability may cause it simply to bury the shareholders in an avalanche of trivial information—a result that is

hardly conducive to informed decisionmaking. Precisely these dangers are presented, we think, by the definition of a material fact adopted by the Court of Appeals in this case—a fact which a reasonable shareholder *might* consider important. We agree with Judge Friendly, speaking for the Court of Appeals in *Gerstle*, that the "might" formulation is "too suggestive of mere possibility, however unlikely." 478 F. 2d, at 1302.

The general standard of materiality that we think best comports with the policies of Rule 14a–9 is as follows: An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard is fully consistent with *Mills'* general description of materiality as a requirement that "the defect have a significant *propensity* to affect the voting process." It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.[10]

_____

[10] In defining materiality under Rule 14a–9, we are, of course, giving content to a rule promulgated by the SEC pursuant to broad statutory authority to promote "the public interest" and "the protection of investors." See n. 2, *supra*. Cf. *Ernst & Ernst* v. *Hochfelder*, 425 U. S., at 212–214. Under these circumstances, the SEC's view of the proper balance between the need to insure adequate disclosure and the need to avoid the adverse consequences of setting too low a threshold for civil liability is entitled to consideration. Cf. *Northern Indiana Public Service Co.* v. *Izaac Walton League*, 423 U. S. 12, 15 (1975); *Udall* v. *Tallman*, 380

## D

The issue of materiality may be characterized as a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts. In considering whether summary judgment on the issue is appropriate,[11] we must bear in mind that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality. The determination requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact.[12] Only if the established omissions are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality" is the ultimate issue of materiality appropriately resolved "as a matter of law" by summary judgment. *Johns Hopkins University* v. *Hutton*, 422 F. 2d 1124, 1129 (CA4 1970). See *Smallwood* v. *Pearl Brewing Co.*, 489 F. 2d, at 604; *Rogen* v. *Ilikon Corp.*, 361 F. 2d 260, 265–267 (CA1 1966).

## III

The omissions found by the Court of Appeals to have been materially misleading as a matter of law involved two general issues—the degree of National's control over TSC at the time of the proxy solicitation, and the favor-

U. S. 1, 16–17 (1965). The standard we adopt is supported by the SEC. Brief for the Securities and Exchange Commission as *Amicus Curiae* 13.

[11] Federal Rule Civ. Proc. 56 (c) permits summary judgment only when "there is no genuine issue as to any material fact."

[12] In an analogous context, the jury's unique competence in applying the "reasonable man" standard is thought ordinarily to preclude summary judgment in negligence cases. See 10 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2729 (1973).

ability of the terms of the proposed transaction to TSC shareholders.

## A. *National's Control of TSC*

The Court of Appeals concluded that two omitted facts relating to National's potential influence, or control, over the management of TSC were material as a matter of law. First, the proxy statement failed to state that at the time the statement was issued, the chairman of the TSC board of directors was Stanley Yarmuth, National's president and chief executive officer, and the chairman of the TSC executive committee was Charles Simonelli, National's executive vice president. Second, the statement did not disclose that in filing reports required by the SEC, both TSC and National had indicated that National "may be deemed to be a 'parent' of TSC as that term is defined in the Rules and Regulations under the Securities Act of 1933." App. 490, 512, 517.[13] The

---

[13] The quoted language is from National's Form 13D, filed in compliance with § 13 (d) of the Securities Exchange Act, 15 U. S. C. § 78m (d). See 17 CFR § 240.13d–1 (1975). Substantially identical language appeared in TSC's Form 10–K, and was incorporated by reference into its Form 8–K, both filed in compliance with § 13 (a) of the Securities Exchange Act, 15 U. S. C. § 78m (a). See 17 CFR §§ 240.13a–10–11 (1975). The term "parent" is defined in SEC Rule 12b–2 (a), (f), (k), 17 CFR §§ 240.12b–2 (a), (f), (k) (1975):

"Unless the context otherwise requires, the following terms, when used in the rules contained in this regulation or in Regulation 13A or 15D or in the forms for statements and reports filed pursuant to sections 12, 13 or 15 (d) of the [Securities Exchange] Act, shall have the respective meanings indicated in this rule:

"(a) *Affiliate*. An 'affiliate' of, or a person 'affiliated' with, a specified person, is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.

.        .        .        .        .

"(f) *Control*. The term 'control' (including the terms 'controlling,' 'controlled by' and 'under common control with') means

Court of Appeals noted that TSC shareholders were relying on the TSC board of directors to negotiate on their behalf for the best possible rate of exchange with National. It then concluded that the omitted facts were material because they were "persuasive indicators that the TSC board was in fact under the control of National, and that National thus 'sat on both sides of the table' in setting the terms of the exchange." 512 F. 2d, at 333.

We do not agree that the omission of these facts, when viewed against the disclosures contained in the proxy statement, warrants the entry of summary judgment against TSC and National on this record. Our conclusion is the same whether the omissions are considered separately or together.

The proxy statement prominently displayed the facts that National owned 34% of the outstanding shares in TSC, and that no other person owned more than 10%. App. 262–263, 267. It also prominently revealed that 5 out of 10 TSC directors were National nominees, and it recited the positions of those National nominees with National—indicating, among other things, that Stanley Yarmuth was president and a director of National, and that Charles Simonelli was executive vice president and a director of National. *Id.*, at 267. These disclosures clearly revealed the nature of National's relationship with TSC and alerted the reasonable shareholder to the fact that National exercised a degree of influence over TSC. In view of these disclosures, we certainly cannot

---

the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

. . . . .

"(k) *Parent*. A 'parent' of a specified person is an affiliate controlling such person directly, or indirectly through one or more intermediaries."

The Rules and Regulations under the Securities Act of 1933 contain the identical definitions. 17 CFR §§ 230.405 (a), (f), (n) (1975).

say that the additional facts that Yarmuth was chairman of the TSC board of directors and Simonelli chairman of its executive committee were, on this record, so obviously important that reasonable minds could not differ on their materiality.

Nor can we say that it was materially misleading as a matter of law for TSC and National to have omitted reference to SEC filings indicating that National "may be deemed to be a parent of TSC." As we have already noted, both the District Court and the Court of Appeals concluded, in denying summary judgment on the Rule 14a–3 claim, that there was a genuine issue of fact as to whether National actually controlled TSC at the time of the proxy solicitation. We must assume for present purposes, then, that National did not control TSC. On that assumption, TSC and National obviously had no duty to state without qualification that control did exist. If the proxy statements were to disclose the conclusory statements in the SEC filings that National "may be deemed to be a parent of TSC," then it would have been appropriate, if not necessary, for the statement to have included a disclaimer of National control over TSC or a disclaimer of knowledge as to whether National controlled TSC.[14] The net contribution of including the contents of the SEC filings accompanied by such disclaimers is not of such obvious significance, in view of the other facts contained in the proxy statement, that their exclusion renders the statement materially misleading as a matter of law.[15]

---

[14] It is the position of National and TSC that "[s]ince National and the old TSC management . . . never drew any clear-cut battle lines, no one ever really knew who could ultimately control TSC during the entire period between the Schmidt purchase and consummation of the shareholder-approved purchase of TSC's assets." Brief for Petitioners 33.

[15] We emphasize that we do not intend to imply that facts suggestive of control need be disclosed only if in fact there was con-

## B. *Favorability of the Terms to TSC Shareholders*

The Court of Appeals also found that the failure to disclose two sets of facts rendered the proxy statement materially deficient in its presentation of the favorability of the terms of the proposed transaction to TSC shareholders. The first omission was of information, described by the Court of Appeals as "bad news" for TSC shareholders, contained in a letter from an investment banking firm whose earlier favorable opinion of the fairness of the proposed transaction was reported in the proxy statement. The second omission related to purchases of National common stock by National and by Madison Fund, Inc., a large mutual fund, during the two years prior to the issuance of the proxy statement.

### 1

The proxy statement revealed that the investment banking firm of Hornblower & Weeks-Hemphill, Noyes had rendered a favorable opinion on the fairness to TSC shareholders of the terms for the exchange of TSC shares for National securities. In that opinion, the proxy statement explained, the firm had considered, "among other

---

trol. If, for example, the proxy statement in this case had failed to reveal National's 34% stock interest in TSC and the presence of five National nominees on TSC's board, these omissions would have rendered the statement materially misleading as a matter of law, regardless of whether National can be said with certainty to have been in "control" of TSC. The reasons for this are twofold. First, to the extent that the existence of control was, at the time of the proxy statement's issuance, a matter of doubt to those responsible for preparing the statement, we would be unwilling to resolve that doubt against disclosure of facts so obviously suggestive of control. Second, and perhaps more to the point, even if National did not "control" TSC, its stock ownership and position on the TSC board make it quite clear that it enjoyed some influence over TSC, which would be of obvious importance to TSC shareholders.

things, the current market prices of the securities of both corporations, the high redemption price of the National Series B preferred stock, the dividend and debt service requirements of both corporations, the substantial premium over current market values represented by the securities being offered to TSC stockholders, and the increased dividend income." App. 267.

The Court of Appeals focused upon the reference to the "substantial premium over current market values represented by the securities being offered to TSC stockholders," and noted that any TSC shareholder could calculate the apparent premium by reference to the table of current market prices that appeared four pages later in the proxy statement. *Id.*, at 271. On the basis of the recited closing prices for November 7, 1969, five days before the issuance of the proxy statement, the apparent premiums were as follows. Each share of TSC Series 1 preferred, which closed at $12, would bring National Series B preferred stock and National warrants worth $15.23—for a premium of $3.23, or 27% of the market value of the TSC Series 1 preferred. Each share of TSC common stock, which closed at $13.25, would bring National Series B preferred stock and National warrants worth $16.19—for a premium of $2.94, or 22% of the market value of TSC common.[16]

---

[16] The premium based upon November 7, 1969, closing prices is calculated as follows:

|  | TSC Preferred | TSC Common |
|---|---|---|
| National B pfd. at (16⅝) ..... | $9.98 (.6 sh.) | $8.31 (.5 sh.) |
| National warrant (at 5¼) ..... | 5.25 | 7.88 (1½ war.) |
| Total ................. | $15.23 | $16.19 |
| Less TSC market (pfd. 12) com. 13¼) ................. | 12.00 | 13.25 |
| Premium .............. | 3.23 | 2.94 |
| Premium expressed as a percentage of TSC market... | 27% | 22% |

The closing price of the National warrants on November 7, 1969, was, as indicated in the proxy statement, $5.25. The TSC shareholders were misled, the Court of Appeals concluded, by the proxy statement's failure to disclose that in a communication two weeks after its favorable opinion letter, the Hornblower firm revealed that its determination of the fairness of the offer to TSC was based on the conclusion that the value of the warrants involved in the transaction would not be their current market price, but approximately $3.50. If the warrants were valued at $3.50 rather than $5.25, and the other securities valued at the November 7 closing price, the court figured, the apparent premium would be substantially reduced—from $3.23 (27%) to $1.48 (12%) in the case of the TSC preferred, and from $2.94 (22%) to $0.31 (2%) in the case of TSC common. "In simple terms," the court concluded: "TSC and National had received some good news and some bad news from the Hornblower firm. They chose to publish the good news and omit the bad news." 512 F. 2d, at 335.

It would appear, however, that the subsequent communication from the Hornblower firm, which the Court of Appeals felt contained "bad news," contained nothing new at all. At the TSC board of directors meeting held on October 16, 1969, the date of the initial Hornblower opinion letter, Blancke Noyes, a TSC director and a partner in the Hornblower firm, had pointed out the likelihood of a decline in the market price of National warrants with the issuance of the additional warrants involved in the exchange, and reaffirmed his conclusion that the exchange offer was a fair one nevertheless. The subsequent Hornblower letter, signed by Mr. Noyes, purported merely to explain the basis of the calculations underlying the favorable opinion rendered in the Oc-

tober 16 letter. "In advising TSC as to the fairness of the offer from [National]," Mr. Noyes wrote, "we concluded that the warrants in question had a value of approximately $3.50." [17] On its face, then, the subsequent letter from Hornblower does not appear to have contained anything to alter the favorable opinion rendered in the October 16 letter—including the conclusion that the securities being offered to TSC shareholders represented a "substantial premium over current market values."

The real question, though, is not whether the subsequent Hornblower letter contained anything that altered the Hornblower opinion in any way. It is, rather,

[17] The body of the subsequent Hornblower letter, dated October 31, 1969, from Mr. Noyes to Stanley Yarmuth, president of National, reads in full:

"You have asked for our opinion as to the value of warrants to be issued in connection with your proposed acquisition of TSC Industries. We understand that these warrants have terms identical to the National Industries (NII) warrants listed on the American Stock Exchange which allow the holder to purchase one NII Common at the price of $21.40 until October 31, 1978. We further understand that you desire our determination as of October 9, 1969.

"Our evaluation of these warrants was made from the point of view of the stockholders of TSC Industries, of which I am a director. In advising TSC as to the fairness of the offer from NII it was necessary to determine whether the value of the warrants was reflected by the market price of the outstanding 487,000 warrants on the day in question. We did so in the light of the fact that approximately 2.6 million additional warrants would be issued in connection with the acquisition.

"After studying price relationships of other warrants traded publicly, referring to customary systems of warrant evaluation, and considering the particulars of the proposed acquisition, we concluded that the warrants in question had a value of approximately $3.50.

"If you have any questions concerning our evaluation, please feel free to call." App. 519.

whether the advice given at the October 16 meeting, and reduced to more precise terms in the subsequent Hornblower letter—that there might be a decline in the market price of the National warrants—had to be disclosed in order to clarify the import of the proxy statement's reference to "the substantial premium over current market values represented by the securities being offered to TSC stockholders." We note initially that the proxy statement referred to the substantial premium as but one of several factors considered by Hornblower in rendering its favorable opinion of the terms of exchange. Still, we cannot assume that a TSC shareholder would focus only on the "bottom line" of the opinion to the exclusion of the considerations that produced it.

TSC and National insist that the reference to a substantial premium required no clarification or supplementation, for the reason that there was a substantial premium even if the National warrants are assumed to have been worth $3.50. In reaching the contrary conclusion, the Court of Appeals, they contend, ignored the rise in price of TSC securities between early October 1969, when the exchange ratio was set, and November 7, 1969—a rise in price that they suggest was a result of the favorable exchange ratio's becoming public knowledge. When the proxy statement was mailed, TSC and National contend, the market price of TSC securities already reflected a portion of the premium to which Hornblower had referred in rendering its favorable opinion of the terms of exchange. Thus, they note that Hornblower assessed the fairness of the proposed transaction by reference to early October market prices of TSC preferred, TSC common, and National preferred. On the basis of those prices and a $3.50 value for the National warrants involved in the exchange, TSC and National contend that the premium was substantial.

Each share of TSC preferred, selling in early October at $11, would bring National preferred stock and warrants worth $13.10—for a premium of $2.10, or 19%. And each share of TSC common, selling in early October at $11.63, would bring National preferred stock and warrants worth $13.25—for a premium of $1.62, or 14%.[18] We certainly cannot say as a matter of law that these premiums were not substantial. And if, as we must assume in considering the appropriateness of summary judgment, the increase in price of TSC's securities from early October to November 7 reflected in large part the market's reaction to the terms of the proposed exchange, it was not materially misleading as a matter of law for the proxy statement to refer to the existence of a substantial premium.

There remains the possibility, however, that although TSC and National may be correct in urging the existence of a substantial premium based upon a $3.50 value for the National warrants and the early October market prices of the other securities involved in the transaction, the proxy statement misled the TSC shareholder to calculate a premium substantially in excess of that premium. The premiums apparent from early October

---

[18] The premium based upon a $3.50 value for the National warrants and the closing prices of the other securities involved on October 9, 1969, the day the exchange ratio was set, is calculated as follows:

|  | TSC Preferred | TSC Common |
|---|---|---|
| National B pfd. (at 16).... | $9.60 (.6 sh.) | $8.00 (.5 sh.) |
| National warrant (at 3.50). | 3.50 | 5.25 (1½ war.) |
| Total ............... | $13.10 | $13.25 |
| Less TSC market (pfd. 11) (com. 11⅝)............. | 11.00 | 11.63 |
| Premium ............ | 2.10 | 1.62 |
| Premium expressed as a percentage of TSC market. | 19% | 14% |

market prices and a $3.50 value for the National warrants—19% on TSC preferred and 14% on TSC common—are certainly less than those that would be derived through use of the November 7 closing prices listed in the proxy statement—27% on TSC preferred and 22% on TSC common. But we are unwilling to sustain a grant of summary judgment to Northway on that basis. To do so we would have to conclude as a matter of law, first, that the proxy statement would have misled the TSC shareholder to calculate his premium on the basis of November 7 market prices, and second, that the difference between that premium and that which would be apparent from early October prices and a $3.50 value for the National warrants was material. These are questions we think best left to the trier of fact.

2

The final omission that concerns us relates to purchases of National common stock by National and by Madison Fund, Inc., a mutual fund. Northway notes that National's board chairman was a director of Madison, and that Madison's president and chief executive, Edward Merkle, was employed by National pursuant to an agreement obligating him to provide at least one day per month for such duties as National might request.[19] Northway contends that the proxy statement, having called the TSC shareholders' attention to the market prices of the securities involved in the proposed transaction, should have revealed substantial purchases of National common stock made by National and Madison during the two years prior to the issuance of the proxy

---

[19] Employed in 1967, Merkle initially received a salary of $2,500 per year (increased in 1968 to $12,000) and an option to purchase 10,000 shares of National common stock. App. 520, 522.

statement.[20]  In particular, Northway contends that the TSC shareholders should, as a matter of law, have been informed that National and Madison purchases accounted for 8.5% of all reported transactions in National common stock during the period between National's acquisition of the Schmidt interests and the proxy solicitation. The theory behind Northway's contention is that disclosure of these purchases would have pointed to the existence, or at least the possible existence, of conspiratorial manipulation of the price of National common stock, which would have had an effect on the market price of the National preferred stock and warrants involved in the proposed transaction.[21]

Before the District Court, Northway attempted to demonstrate that the National and Madison purchases were coordinated.  The District Court concluded, however, that there was a genuine issue of fact as to whether there was coordination.  Finding that a showing of coordination was essential to Northway's theory, the District Court denied summary judgment.

The Court of Appeals agreed with the District Court that "collusion is not conclusively established."  512 F. 2d, at 336.  But observing that "it is certainly suggested," *ibid.,* the court concluded that the failure to disclose the

---

[20] In a table entitled "Statements of Consolidated Stockholders' Equity," the proxy statement indicated that National acquired aproximately 83,000 shares of its own common stock in 1968 and 1969, while it sold approximately 67,000 shares under stock option plans, employment agreements, and warrants.  *Id.,* at 324, 330.  The proxy statement did not disclose that Madison acquired approximately 170,000 shares of National common during the two-year period, or that approximately one year prior to the proxy solicitation Madison acquired $2 million in National debentures convertible to common.

[21] See n. 1, *supra.*

purchases was materially misleading as a matter of law.
The court explained:

> "Stockholders contemplating an offer involving pre-
> ferred shares convertible to common stock and
> warrants for the purchase of common stock must
> be informed of circumstances which tend to indi-
> cate that the current selling price of the common
> stock involved may be affected by apparent market
> manipulations. It was for the shareholders to deter-
> mine whether the market price of the common shares
> was relevant to their evaluation of the convertible
> preferred shares and warrants, or whether the activi-
> ties of Madison and National actually amounted to
> manipulation at all." *Ibid.*

In short, while the Court of Appeals viewed the pur-
chases as significant only insofar as they suggested
manipulation of the price of National securities, and
acknowledged the existence of a genuine issue of fact
as to whether there was any manipulation, the court
nevertheless required disclosure to enable the sharehold-
ers to decide whether there was manipulation or not.

The Court of Appeals' approach would sanction the
imposition of civil liability on a theory that undisclosed
information may *suggest* the existence of market manipu-
lation, even if the responsible corporate officials knew
that there was in fact no market manipulation. We do
not agree that Rule 14a–9 requires such a result. Rule
14a–9 is concerned only with whether a proxy statement
is misleading with respect to its presentation of material
facts. If, as we must assume on a motion for summary
judgment, there was no collusion or manipulation what-
soever in the National and Madison purchases—that is,
if the purchases were made wholly independently for
proper corporate and investment purposes, then by
Northway's implicit acknowledgment they had no bear-

ing on the soundness and reliability of the market prices listed in the proxy statement,[22] and it cannot have been materially misleading to fail to disclose them.[23]

That is not to say, of course, that the SEC could not enact a rule specifically requiring the disclosure of purchases such as were involved in this case, without regard to whether the purchases can be shown to have been collusive or manipulative. We simply hold that if liability is to be imposed in this case upon a theory that it was misleading to fail to disclose purchases suggestive of market manipulation, there must be some showing that there was in fact market manipulation.[24]

## IV

In summary, none of the omissions claimed to have been in violation of Rule 14a-9 were, so far as the record reveals, materially misleading as a matter of law, and Northway was not entitled to partial summary judgment.

---

[22] There has been no suggestion that the purchases in question would have any significance if there was in fact no manipulation or collusion, although there may perhaps be such a claim in another case. Nor is there any indication that manipulation or collusion are matters as to whose existence National might have been left in doubt at the time the proxy statement was issued. Cf. n. 16, *supra*.

[23] In holding that the failure to disclose the National and Madison purchases violated Rule 14a-9 as a matter of law, the Court of Appeals not only found it unnecessary to consider whether there was in fact any collusion or manipulation, but also found it unnecessary to consider whether the purchases had any significant effect on the price of National common stock or, more pertinently, the price of the National preferred stock and warrants involved in the proposed transaction. Since we find the existence of a genuine issue of fact with respect to whether there was manipulation sufficient to bar summary judgment, it is unnecessary to consider the remaining aspects of the Court of Appeals' decision.

[24] Of course, such a showing may be by circumstantial as well as direct evidence, and the purchases themselves may be considered.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.