**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

No. 97-2522MN

_____

| | | |
|---|---|---|
| Richard J. Rodney, Jr.; Doug Shonka; | * | |
| Carl Patrick Monahan; Jerry Hoehnen; | * | |
| Rosemary Boris; Thomas W. Newcome, | * | |
| III; Delvin D. Junker; Printing Mailing | * | |
| Trade District, affiliated with the | * | |
| Newspaper Drivers' Division of the | * | |
| International Brotherhood of the | * | |
| Teamsters, on behalf of themselves and | * | |
| all others similarly situated; History | * | |
| Theater, Inc., a Minnesota non-profit | * | Appeal from the United States |
| corporation; Paul Gold; Bernard | * | District Court for the District |
| Friedman, on behalf of themselves and | * | of Minnesota. |
| all others similarly situated, | * | |
| | * | |
| Appellants, | * | |
| | * | |
| v. | * | |
| | * | |
| KPMG Peat Marwick, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: February 12, 1998
Filed: May 12, 1998

_____

Before FAGG, JOHN R. GIBSON, and MURPHY, Circuit Judges.

_____

FAGG, Circuit Judge.

This is a class action securities fraud case against KPMG Peat Marwick (KPMG) as auditor of the Piper Funds Inc. Institutional Government Income Portfolio (the Fund). The members of the plaintiff class (the Investors), approximately 8000 shareholders who invested in the Fund between September 30, 1991 and April 11, 1994 (the class period), appeal from the district court's order granting summary judgment in favor of KPMG. Although the Fund's prospectuses discussed most of the Fund's investments and their risks, the Investors contend the Fund's investments violated three of its own self-imposed investment restrictions, and KPMG failed to meet its duty to disclose these violations. We will call these investment restriction claims the noncompliance claims. The Investors also brought a nondisclosure claim, contending KPMG failed to reveal that the Fund's portfolio had a longer average life, and thus was riskier, than the Fund said it had. Without contesting any of these four claims, KPMG argued anything it omitted to say would not have significantly altered the mix of available information, so the claimed omissions were immaterial as a matter of law. The district court agreed with KPMG, but we do not. We reverse and remand for further proceedings.

Some explanation of the Fund's investments will help orient the reader to this factually complex case. Unless otherwise noted, we rely on the Fund's own prospectuses for our information. During the class period, the Fund invested primarily in mortgage-related securities. The Fund bought mortgage-backed securities familiarly known under names like Fannie Mae and Freddie Mac. These securities are issued by federal entities that assemble pools of mortgage loans, and the security entitles its holder to receive a portion of the principal and interest payments on the underlying loans. The Fund also traded heavily in a variety of mortgage-backed derivatives. These included collateralized mortgage obligations (CMOs), which divide up principal and interest flowing into a mortgage pool into shares of various classes or "tranches" with different payment priorities. For a more detailed explanation of CMOs, see Banca Cremi, S.A. v. Alex. Brown & Sons, Inc., 132 F.3d 1017, 1022-23 (4th Cir. 1997) (Magill, J.). Some of the Fund's CMOs were floating rate CMOs, with rates subject

to periodic readjustment in step with a particular index, like an adjustable-rate mortgage. Others were inverse or reverse floating CMOs, with adjustable rates that move against the index. The Fund also bought interest-only and principal-only stripped mortgage-backed securities (SMBSs). As their names suggest, these securities deliver distributions from either interest or principal payments, but not both. The Fund's derivatives were highly sensitive to interest-rate change. According to the Investors, when the Federal Reserve Board raised interest rates in 1994, the Fund was heavily invested in principal-only SMBSs and inverse floating CMOs, both of which are especially hard hit when interest rates go up.

In addition, the Fund engaged in "forward commitments." In these transactions, a security is bought or sold at a fixed price, but payment is delayed until a future date. Meanwhile, the value of the security may fluctuate, resulting in a gain or loss when payment day arrives. The Fund also entered into repurchase agreements, buying securities subject to the seller's agreement to repurchase them after a stated period of time. Repurchase agreements can be characterized as loans, with the bought-and-resold security functioning as collateral. See 15 U.S.C. § 80a-2(a)(23) (1994) ("'Lend' includes a purchase coupled with an agreement by the vendor to repurchase; 'borrow' includes a sale coupled with a similar agreement."). All of these various investments and transactions--CMOs, floating and inverse floating CMOs, SMBSs, forward commitments, and repurchase agreements--were disclosed by the Fund, along with their risks.

In a letter to shareholders dated April 12, 1994, the Fund revealed for the first time that it had also engaged in what it called a "sale forward program," which "involve[d] the sale of securities and a simultaneous agreement to repurchase them at a later date." As a result, the letter said, the Fund was "[c]urrently . . . 35% leveraged." Based in part on this letter, the Investors contend the Fund was on the borrowing as well as the lending side of repurchase agreements. From the borrowing side, the transaction is called a reverse repurchase agreement. See Securities Trading Practices

of Registered Investment Companies, Investment Company Act Release No. 10,666, 6 Fed. Sec. L. Rep. (CCH) ¶ 48,525, at 37,553-4 & n.2 (Apr. 18, 1979). The Investors claim the Fund's reverse repurchase agreements took the form of dollar rolls, which "can be thought of as a collateralized borrowing, where an institution pledges mortgage pass-throughs to a dealer to obtain cash." Steven J. Carlson & John F. Tierney, Collateralized Borrowing via Dollar Rolls, in The Handbook of Mortgage-Backed Securities 1019, 1020 (Frank J. Fabozzi ed., 3d ed. 1992). Based on internal KPMG documents, the Investors contend KPMG knew of the Fund's dollar rolls.

We turn now to the Investors' three noncompliance claims. The Fund's prospectuses stated that, among other prohibitions, the Fund could not borrow money, issue senior securities, or invest in securities "which in the opinion of the Fund's investment adviser at the time of such investment are not readily marketable." (This last restriction was later changed to a nonfundamental policy, as disclosed in the Fund's prospectus dated February 1, 1994.) As fundamental investment policies, these three restrictions could be changed only by the shareholders themselves. See 15 U.S.C. §§ 80a-13(a)(2), (3) (1994).

First, the Investors contend the Fund's undisclosed dollar rolls violated the no-borrowing rule. The Investors claim the Fund's forward commitments also violated the same restriction. Forward commitments generate leverage. See 6 Fed. Sec. L. Rep. ¶ 48,525, at 37,553-6. Creating leverage, the Investors say, is really the same as borrowing because in either case the shareholders achieve a right to return on a capital base that exceeds the sum of their contributions. See id. ¶ 48,525, at 37,553-5 n.5. Second, the Investors claim some of the Fund's investments in derivatives violated the rule against buying illiquid or not readily marketable securities. The Investors base this claim in part on the prospectuses of other funds managed by the Fund's investment adviser during the class period. According to the Investors, these documents describe as illiquid the same kinds of securities the Fund was buying. The Investors contend KPMG knew the Fund was buying illiquid securities, based on a 1992 document in

which KPMG characterized a large number of the Fund's holdings as "thinly traded" and reported it was unable to obtain secondary price quotations for 52% of the Fund's portfolio. Third, the Investors claim the Fund's forward commitments involved the issuance of senior securities, see id. ¶ 48,525, at 37,553-6, because the Fund failed to segregate sufficient liquid assets to cover these commitments, as the Securities and Exchange Commission (SEC) requires, see id. ¶ 48,525, at 37,553-8.

The Investors' nondisclosure claim concerns the following statement: "The Fund expects to maintain an average weighted life of its portfolio securities (other than inverse floating CMOs) ranging from approximately three to five years." According to the Investors, this statement led them to believe the Fund was a short-term and thus comparatively safe fixed-income investment, a belief the Investors say the Fund reinforced by comparing its performance with that of the Merrill Lynch 3-5 Year Treasury Bond Index and by advertising its first-place ranking among short-term government funds. The Investors contend the actual average life of the Fund's portfolio, inverse floaters included, was at least fourteen years. Because risk increases as the average life of a debt-securities portfolio lengthens, the Investors believe the Fund's three-to-five-year average life projection was materially misleading, and KPMG should have shed light here as well.

When the Federal Reserve Board tightened monetary policy early in 1994, interest rates rose and the price of Fund shares fell sharply. The Investors filed suit against the Fund and its investment adviser in May 1994. That lawsuit settled. The Investors brought this action against KPMG in August 1994, asserting federal claims under § 11 of the Securities Act of 1933, 15 U.S.C. § 77k (1994); § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1994), and Rule 10b-5, 17 C.F.R. § 240.10b-5 (1994); and §§ 34(b) and 47(b) of the Investment Company Act of 1940, 15 U.S.C. §§ 80a-33(b), -46(b) (1994). The Investors also asserted supplemental state-law claims of negligence and negligent misrepresentation. After extensive discovery, KPMG filed a motion for partial summary judgment on the Investors'

federal-law claims. Although KPMG now takes issue with the Investors' factual assertions, KPMG contested none of them in its summary judgment motion. That being so, we must accept the facts asserted in the Investors' complaint as true. See Kegel v. Runnels, 793 F.2d 924, 927 (8th Cir. 1986). Neither did KPMG dispute the scope of its potential liability under the federal securities laws. Instead, KPMG took the position that the Investors were complaining solely about risks inherent in the Fund's investments. KPMG argued that because those risks were fully aired by the Fund and in the media, anything KPMG may have omitted to disclose about what it calls "subsidiary issues" was immaterial as a matter of law. KPMG also contended the claims of class members who purchased Fund shares before August 1, 1993 were time barred. The district court declined to rule on the statute of limitations issue, but granted KPMG's motion on the materiality ground for reasons we will explain below. After the district court made its summary judgment ruling, the parties agreed to a dismissal without prejudice of the remaining state-law claims, and the district court entered final judgment in favor of KPMG. This appeal followed.

We review de novo the district court's order granting summary judgment. See Moorhead v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 949 F.2d 243, 245 (8th Cir. 1991). We must affirm if the record, viewed in a light most favorable to the Investors as the nonmoving party, shows there is no genuine issue as to any material fact and KPMG is entitled to judgment as a matter of law. See id.; Fed. R. Civ. P. 56(c). To be actionable under the federal securities laws, misrepresentations or omissions must be material. See Parnes v. Gateway 2000, Inc., 122 F.3d 539, 546 (8th Cir. 1997). For an omission to be material, there must be "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" Id. (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)). Although materiality may be decided as a matter of law in appropriate cases, see id. at 546-48, courts should bear in mind that "[t]he [materiality] determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance

of those inferences to [the shareholder]," <u>TSC Indus., Inc. v. Northway, Inc.</u>, 426 U.S. 438, 450 (1976). For that reason, unless "a reasonable investor could not have been swayed by an alleged misrepresentation" or omission, materiality "presents a factual question for a jury to decide." <u>Parnes</u>, 122 F.3d at 546.

We find the district court's reasons for rejecting the Investors' noncompliance claims unconvincing. The district court explained its ruling this way: "No reasonable person reading the prospectuses and the financial reports could conclude that the investment restriction was meant to prohibit investment in derivatives, because these documents all clearly stated that the Fund could and did invest in derivatives." This analysis has several flaws. First, it distorts the Investors' position. The Investors do not argue that all derivatives would violate the Fund's restrictions, merely that some of them did. Second, it fails to dispose of the Investors' borrowing claim, which turns on the structure of Fund transactions, not on the type of securities purchased. Forward commitments and dollar rolls are not derivatives. Also, the Fund's prospectuses never revealed the dollar rolls, which are reverse repurchase agreements and thus borrowing in the context of 15 U.S.C. § 80a-2(a)(23) and the SEC's interpretive release, <u>see</u> 6 Fed. Sec. L. Rep. ¶ 48,525, at 37,553-4. Third, and more generally, the district court could not resolve the conflict between the Fund's rules and its investment practices by reading the restrictions out of existence. The record creates a genuine dispute whether some of the Fund's investments did in fact break its rules because a reasonable jury could conclude the rules were broken. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Further on, the district court characterized the restrictions as general statements trumped by the Fund's more specific investment disclosures. <u>See</u> <u>Banca Cremi</u>, 132 F.3d at 1031 ("[A] general statement creates less justifiable reliance than would a specific statement.") (emphasis omitted). We disagree. The Fund specifically said it could not buy illiquid securities, borrow money, or issue senior securities. These rules have nothing in common with the sort of puffing statements this court and others have held too general to be material. <u>See</u> <u>Parnes</u>, 122 F.3d at 547 (discussing cases from other circuits).

The district court offered a second explanation for its ruling. According to the court, any failure to reveal risks created by the Fund's claimed rule-breaking made no difference because the Investors' losses were caused by rising interest rates, a risk the Fund did disclose. "When the total mix of information included in a prospectus clearly identifies the very risks that come to pass," the district court said, "there is no genuine issue of fact that misrepresentations or omissions are material." But materiality is not assessed after the fact. If it were, materiality would never present a jury question, hindsight being 20/20. Rather, a court must ask "whether the 'reasonable investor' would have considered the omitted information significant at the time." Basic Inc., 485 U.S. at 232. Otherwise, companies subject to federal securities laws could fraudulently induce investments by concealing significant risks and escape liability so long as only disclosed risks came to pass. Just because a hidden risk does not materialize doesn't mean its concealment cannot hurt investors. The totality of available information about a particular security affects its price. See id. at 241-42, 247. Had KPMG revealed the Fund's violations (assuming rules were broken), the Investors might have bought in at a lower price and thus lost less. Some might have shied away from the Fund entirely.

In sum, we disagree with the district court's ruling on the Investors' noncompliance claims. Reasonable investors reading the Fund's prospectuses and KPMG's reports would conclude that, whatever risks they were accepting by investing in a mutual fund that traded in derivatives and engaged in forward commitments, they were not encountering the enhanced risks created by violations of the Fund's own basic investment policies. See 6 Fed. Sec. L. Rep. ¶ 48,525, at 37,553-5 (borrowing and issuance of senior securities increase speculative nature of a fund's portfolio). The Investors were assured there were lines the Fund could not and would not cross. The Investors contend the Fund crossed some of those lines. If they are right, and viewing the record in their favor we have to assume they are, we cannot say KPMG's silence on these matters did not deprive them of information that would have made a difference to a reasonable investor. A jury might decide otherwise, but it is their call. The few related cases we have found are in step with our conclusion. See Krouner v. American

<u>Heritage Fund, Inc.</u>, No. 94 Civ. 7213 (WK), 1996 WL 393584, at *3 (S.D.N.Y. July 15, 1996) (claimed violation of basic policy limiting purchases of illiquid securities is material); <u>In re TCW/DW North American Gov't Income Trust Sec. Litig.</u>, 941 F. Supp. 326, 339 (S.D.N.Y. 1996) (claimed failure to disclose inherent illiquidity of CMO market not immaterial as a matter of law).

We turn now to the Investors' nondisclosure claim. In the Fund's prospectuses dated January 1993 and February 1994, the statement the Investors complain of reads: "The Fund expects to maintain an average weighted life of its portfolio securities (other than inverse floating CMOs) ranging from approximately three to five years." The prospectus dated January 1992 uses the phrase "average weighted maturity" instead of "average weighted life." The Investors prefer "effective duration." The significance of these differences the parties do not explain, but neither do they treat them as important for present purposes. Without meaning to endorse any one of these formulas, we will use the term "average life."

As noted above, the Investors contend the average life of the Fund's portfolio, including inverse floating CMOs, was at least fourteen years, making the Fund a good deal riskier than its announced three-to-five-year average life led the Investors to believe. The Investors do not claim the statement itself, which excluded inverse floaters, was a misrepresentation. Rather, they argue the Fund had to say something more to put the exclusion in context and make the projection not misleading. Quoting two statements from the prospectuses, the district court concluded the Fund had said enough. The first statement reads: "Principal prepayments on collateral underlying a CMO may cause it to be retired substantially earlier than the stated maturities or final distribution dates." This statement points out the risk of shortened maturities, not the opposite risk the Investors are talking about. <u>See</u> <u>Banca Cremi</u>, 132 F.3d at 1022 ("Extension risk is the opposite of prepayment risk."). If anything, the quoted language suggests the portfolio's average life might be shorter if inverse floating CMOs were taken into account.

The second statement reads: "Because the prepayment characteristics of the underlying mortgages vary, it is not possible to predict accurately the realized yield or average life of a particular issue of pass-through certificates." This statement explains why the Fund hedged its average life projection with words like "expects," "ranging," and "approximately," but it does not alert the reader to the level of portfolio maturity risk the Investors claim existed. The statement also fails to call attention to the heightened extension risk posed by inverse floating CMOs, and thus to shed light on the inverse floater exclusion, because the prospectuses never say that inverse floaters are pass-through certificates. See Parnes, 122 F.3d at 548 ("[C]autionary language must relate directly to that by which plaintiffs claim to have been misled." (internal quotations omitted)). This is not a case where reasonable minds would have to agree that the prospectuses included enough cautionary language or risk disclosure to render the challenged statements not misleading. See id. (citing Fecht v. Price Co., 70 F.3d 1078, 1082 (9th Cir. 1995)). Accordingly, the warnings on which the district court relied are insufficient to render the claimed omission immaterial as a matter of law. This question as well must be left to a jury.

We reverse the district court's ruling on both the Investors' noncompliance claims and their nondisclosure claim, and we remand to the district court for further proceedings not inconsistent with this opinion. We express no views one way or the other on KPMG's statute of limitations defense, leaving that issue for the district court to rule on in the first instance.

JOHN R. GIBSON, Circuit Judge, dissenting.

I respectfully dissent. The district court's careful analysis of the issue of reasonable reliance is based on an accurate and perceptive reading of the record before us, and should be affirmed.

To put this case in perspective, a few statements from the first amended complaint should be considered. The investors alleged that the extraordinary decline in the Fund's net asset value occurred after the decision of the Federal Reserve Board to tighten monetary policy. This decision resulted in an interest rate increase on fixed income securities with three-to five-year maturities. As interest rates increased, the price of such securities fell, a slow-down in mortgage refinancing occurred, the duration of mortgage securities in the Fund's portfolio lengthened, and their value decreased. As the price of mortgage securities fell, some investors incurred large losses and sold their holdings. This caused brokerage firms to decrease the value of these types of securities. The investors alleged that these actions affected the Fund more than other funds because of the Fund's investments in derivatives, such as collateralized mortgage obligations, including floating rate CMO's, inverse or reverse floating CMO's, and stripped mortgage-backed securities of two classes, interest only and principal only. The investors alleged that the Fund's net asset value declined more than other similar type funds because many short and intermediate term United States government funds did not use a sale forward program and did not have as much exposure to mortgage-backed derivatives.

The district court recognized that the prospectuses specifically described many of the risks enumerated in the complaint. The court concluded that the investors failed to raise a genuine issue that the total mix of information approved by Peat Marwick was materially misleading.

A statement or omission is considered material if it is one which a reasonable shareholder would, in substantial likelihood, consider important in making an investment decision. TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976); Austin v. Loftsgaarden, 675 F.2d 168, 177 (8th Cir. 1982). Whether the misrepresented or omitted fact is material depends on whether a reasonable investor would regard it as significantly altering the "total mix" of information made available. Id.

Claims of misrepresentation do not lie where defendants adequately warned investors of the specific risks that came to pass. We recognized in Moorhead v. Merrill Lynch, Pierce, Fenner and Smith, Inc., 949 F.2d 243 (8th Cir. 1991), that "plaintiffs could not base a federal securities fraud claim on any misrepresentation or omission in the feasibility study which was addressed by the repeated, specific warnings of significant risk factors and the disclosures of underlying factual assumptions." Id. at 245. When the total mix of information included in a prospectus clearly identifies the very risks that come to pass, courts have held that there is no genuine issue of fact that misrepresentations or omissions are material. See id. Accord Parnes v. Gateway 2000, Inc., 122 F.3d 539, 548 (8th Cir. 1997) (discussing "bespeaks caution doctrine").

In determining reasonable reliance, we have considered the sophistication of the investor. Here, purchases in the Fund required a minimum investment of $25,000. Nine individual plaintiffs alleged they made investments of $100,000, $30,000, $50,000, $102,000, $40,000, $147,000, $300,000, $200,000, and $50,000, and a non-profit fund of a union and a non-profit history theater alleged each made investments of $100,000.

The district court carefully analyzed the issue of reasonable reliance:

> Examination of the prospectuses of the Fund reveals that they addressed all of the alleged nondisclosures. Plaintiffs contend defendant failed to warn of: (1) the fact that the Fund's investment practices were wholly inconsistent with its investment objectives of preservation of principal and sacrificed safety for yield; (2) the duration or maturity of a substantial portion of the Fund's portfolio (because the risk involved exceeded that associated with the low average durations disclosed); (3) the risks presented by the Fund's extensive investment in derivatives; (4) the Funds's use of leverage and the attendant risks; and (5) the

Fund's prohibition from investing in illiquid derivatives and using leverage.

In fact, the prospectuses and the annual reports clearly communicated that the Fund was investing heavily in derivatives. The prospectuses warned that this could risk loss of principal. With regard to maturity, the prospectuses stated that inverse floating CMO's were not included in the projected average maturity weight of the Fund's securities. The prospectuses also warned that "[p]rincipal prepayments on collateral underlying a CMO may cause it to be retired substantially earlier than the stated maturities or final distribution dates," and that "it is not possible to predict accurately the realized yield or average life of a particular issue of pass-through certificates." Any misconception that the average maturity weight assured a low risk investment could have been corrected by reading the prospectuses.

Plaintiffs argue that certain practices of the Fund are the equivalent of borrowing money, which was prohibited by the Fund's restrictions. The problem with this theory is that the prospectuses specifically disclosed these practices and their attendant risks. Most importantly, the prospectuses and reports informed the investor of precisely the kinds of securities in which the Fund invested.

Perhaps plaintiffs' best argument pertains to the issue of liquidity. Piper Jaffray had other funds which classified derivatives as illiquid investments. The prospectuses of the Fund stated that it would not purchase investments which were not readily marketable. Peat Marwick's audits raised questions about the degree to which derivatives were readily marketable. However, the restriction must be considered as part of the total mix of information provided to the investor. No reasonable person reading the prospectuses and the financial reports could conclude that the investment restriction was meant to prohibit investment in derivatives,

-13-

because these documents all clearly stated that the Fund could and did invest in derivatives.

In analyzing the district court's order, the court today parses the investors' arguments in a fashion that simply does not accord with the district court's conclusions or the nature of the arguments asserted. The court takes issue with the district court's characterization of "restrictions as general statements trumped by the Fund's more specific investment disclosures."

The court, however, refers only to part of the district court order when it states that the district court dealt only with the derivative claim and did not dispose of the borrowing claim. The court states: "[f]orward commitments and dollar rolls are not derivatives. . . .[M]ore generally, the district court could not resolve the conflict between the Fund's rules and its investment practices by reading the restrictions out of existence." It is significant, however, that the prospectus specifically referred to the purchase and sale of securities on a forward commitment basis, and explained the nature of such a transaction. The prospectus specifically disclosed that if the fund "chooses to dispose of the right to acquire a when-issued security prior to its acquisition or dispose of its right to deliver or receive against a forward commitment, it can incur a gain or loss." The district court examined this specific language and concluded that the prospectus "specifically disclosed these practices and their attendant risk."[1] The court today limits the reasonable reliance issue to deciding whether there is "a genuine dispute whether some of the Fund's investments did in fact break its rules." The appropriate issue, however, is whether the prospectus plainly informed the investors, in the total mix of information, about the practices of the Fund and their attendant risks, and whether the investors were informed of "precisely the kinds of

---

[1]This conclusion of the district court applies to the dollar rolls, which the court today characterizes as borrowing.

-14-

securities in which the Fund invested." This is the critical issue in the case, and not the substitute issue that the court today proposes.

The court then proceeds to reason that materiality is not assessed after the fact, and that a company subject to the federal securities law could fraudulently induce investments by concealing significant risks and escape liability so long as the disclosed risks come to pass, and that because a hidden risk does not materialize does not mean its concealment cannot hurt investors. The court's reasoning simply looks beyond the claims asserted in the case before us. The significant risks disclosed in the prospectus did indeed come to pass and cause the investors' losses.

The district court's position is similar to that articulated by our brother, Judge Frank J. Magill sitting by designation with the Fourth Circuit, in <u>Banca Cremi S. A. v. Alex. Brown and Sons, Inc.</u>, 132 F.3d 1017 (4th Cir. 1997). In that case, the Fourth Circuit considered warnings in a prospectus quite similar to those here and concluded that the investors did not justifiably rely on a broker's alleged omission or misstatement. <u>Id.</u> at 1031. Like the investors in this case, the investors in <u>Banca Cremi</u> were specifically told of the investment practices of the Fund, the specific risks resulting from those practices, and the inherently risky nature of the investment. <u>See id.</u> at 1028-31. <u>Accord</u> <u>Olkey v. Hyperian, 1999 Term Trust, Inc.</u>, 98 F.2d 2, 5 (2d. Cir. 1996) (prospectuses for investment in mortgage-backed securities specifically warned investors of risk of rising interest rates). Here, the district court determined that the prospectuses warned investors of exactly the risk that the investors now claim was not disclosed. A reasonable investor could not have read the prospectuses without realizing that despite the use of balancing, a significant increase in interest rates could decrease the value of the trust and decrease earnings. The prospectuses specifically warned about the consequences of a rise in interest rates. The district court did not err in holding that there was no reasonable reliance.

I would affirm the district court's grant of summary judgment.

-15-

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.