Harold C. GLADWIN et al.,
Plaintiffs-Appellees,

v.

MEDFIELD CORPORATION et al.,
Defendants-Appellants.

No. 75–2138.

United States Court of Appeals,
Fifth Circuit.

Oct. 22, 1976.

Rehearing Denied Nov. 26, 1976.

George P. Michaely, Jr., Washington, D. C., William J. Schifino, Tampa, Fla., Jon D. Epstein, Houston, Tex., for defendants-appellants.

Allen P. Allweiss, St. Petersburg, Fla., Leonard Barrack, David Berger, Philadelphia, Pa., for plaintiffs-appellees.

Before BROWN, Chief Judge, and GODBOLD and SIMPSON, Circuit Judges.

GODBOLD, Circuit Judge:

This case concerns use of proxy material that is false or misleading with respect to the presentation or omission of material facts.

The Gladwins own voting stock in Medfield, a publicly-held corporation engaged in operating hospitals and other health facilities. On February 6, 1974, in preparation for its March 1 annual shareholder meeting at which directors would be elected, Medfield sent to shareholders a 1973 annual report, a notice of annual meeting, and a proxy statement. Medfield sent additional proxy solicitation material on February 20 and 23. A group known as the Medfield Shareholders Committee nominated a rival slate of candidates and also solicited proxies.

At the annual meeting the slate nominated by the existing directors received 56% of the votes cast, against 44% for the candidates nominated by the rival group.

The Gladwins sued, alleging multiple instances of misstatements or material omissions in Medfield's proxy material in violation of § 14(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78n, and the applicable proxy rules adopted pursuant to the Act.[1] The district court, sitting without a jury, found six violations of § 14(a) in that Medfield's proxy materials:

1) failed to disclose the nature and extent of Medfield's Medicare liabilities;

2) failed to disclose and misrepresented a significant turnover in Medfield management and other related personnel problems;

3) failed to disclose substantial purchases of Medfield stock by directors;

4) failed to adequately disclose the true nature and extent of self-dealing by one of the directors with Medfield;

5) failed to disclose that attempts were being made to sell two major assets of Medfield; and

6) unlawfully impugned the character, integrity and personal reputation of one of the candidates opposed to management.

The court ordered a new election. It directed that proxy solicitation material for such election must include corrections of all

1. SEC Rules 14a–3, 14a–9, and 14a–11; 17 C.F.R. 240.14a–3, 240.14a–9, and 240.14a–11.

illegal misstatements and omissions, a statement that the prior solicitations were in violation of the 1934 Act and the proxy rules, and an explanation that the resolicitation was the result of this suit. By a stipulation, approved by the trial court, the order was stayed pending appeal. We affirm the decision of the district court except to the extent hereinafter indicated.

## I. Disclosure of Medicare liabilities

Medfield and its wholly-owned subsidiary, Palms of Pasadena Hospital, are participants in the Medicare program of the U.S. Department of Health, Education and Welfare. HEW pays for services and products provided to Medicare beneficiaries. Funding is done through "fiscal intermediaries." Reimbursement to a provider of services is made through interim payments based upon estimated costs of the services and products furnished, as defined in Medicare regulations. The fiscal intermediary audits the provider's costs on an annual basis, and adjustments are made depending upon whether the audit indicates that interim payments to the provider have resulted in excessive or insufficient reimbursement. In June 1973 Blue Cross of Florida, Medfield's "fiscal intermediary," notified Medfield that Blue Cross had reached a "tentative final settlement" for fiscal 1969 of $253,553 in overpayments and requested payment within 30 days. In July 1973 Medfield requested a 24-month repayment plan and was advised by the fiscal intermediary that a request for a repayment plan exceeding 12 months must be forwarded to the Regional Office of the Bureau of Health Insurance, a branch of HEW, and must include the first payment under the proposed payout period. During December 1973 Blue Cross informed Medfield of its determinations that it had been overpaid for the years 1970, 1971 and 1972 in the amounts of $367,243, $327,609, and $419,097, respectively .

On January 15, 1974, the fiscal intermediary told Medfield that the total amount "due and owing" from it was $1,836,272, consisting of the above amounts for 1969 through 1972, plus $163,783 for 1973 and

current amounts of $304,987. Blue Cross also told Medfield that current Medicare funds were being withheld because of Medfield's non-payment.

Later in January negotiations ensued pursuant to which Medfield and Blue Cross agreed that Medfield would appeal with respect to amounts said to be owing for 1970, 1971 and 1972, and that the suspended HEW payments would be resumed upon receipt from Medfield of cash flow data and interim financial statements, following which regular payments, less $51,000 per month, would be resumed. While disputing the Blue Cross figures, Medfield asked for a ten-year repayment plan.

In the proxy solicitation the only information provided by Medfield to its stockholders concerning this controversy was in the form of a footnote to the consolidated financial statement in the 1973 annual report, as follows:

(3) ESTIMATED MEDICARE CONTRACTUAL ALLOWANCES:

Palms of Pasadena Hospital, Inc., as a provider under the Medicare Program, has been reimbursed for costs relating to Medicare patients. These reimbursements are subject to adjustment by subsequent examination of the Hospital's accounting records in accordance with existing Medicare regulations.

During the fiscal year ended June 30, 1973, the fiscal intermediary for the Department of Health, Education and Welfare examined the cost of reimbursement reports of the Hospital for the fiscal years ended June 30, 1970, 1971 and 1972. As a result of these examinations, certain adjustments have been proposed which would reduce the amount of the Company's reimbursable cost, and result in refunds to Medicare.

The cumulative liability from the proposed adjustments as calculated by the fiscal intermediary totaled $1,031,555 (before giving effect to Federal income taxes) for the three years ending June 30, 1972.

The primary adjustment proposed relates to the provision of the Medicare

reimbursement regulations which provides that costs applicable to services, etc., furnished to a provider by a related organization can be included in allowable costs of the provider only to the extent of the cost to the related organization. The fiscal intermediary has challenged the opinion of the management and counsel of the Company that Pharmacare, Inc. (which operates the pharmacy within the Hospital and provides all pharmaceutical supplies of the Hospital, and which is 23% owned by Medfield Corporation) is not a related organization as defined in the Medicare regulations. The liability arising from this particular issue represents approximately $513,000 of the total proposed liability.

The remainder of the liability is attributable to proposed adjustments relating to methods of allocation and disputed statistics utilized.

As the Company has disputed all of the above proposed adjustments, and the amount of any ultimate liability is indeterminable at this time, no provisions for such proposed adjustments have been provided.

■ We agree with the district court that this footnote did not sufficiently describe the overpayment controversy as it then existed. It did not reveal the amount of the claim as asserted on January 15, the cessation of HEW payments, or the subsequent arrangements agreed to between Blue Cross and Medfield.[2] An omitted fact is material under Rule 14a–9 "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Industries, Inc. v. Northway, Inc.,* —— U.S. ——, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757, 766 (1976).[3] No rational argument can be mounted that the

omissions which we have described were not material.

■ Medfield's major point on this appeal is that the district court erred in describing the amount of $1,836,272 as "due and owing" and "due within thirty days." It urges that under the Medicare Act and the regulations no amount of overpayments was ascertained with finality nor were the overpayments, whatever the amount, due and payable within 30 days. Medfield views the asserted amount as a tentative figure, subject to administrative review and appeals in which final, liquidated liability would be determined. It asserts that there is no provision in the statute or the regulations making a fiscal intermediary's determination of proposed final liability payable in 30 days. In support of its position Medfield represents to us that through administrative review and appeals, and after the judgment of the district court in this case, overpayments for the periods in question were found to be only $203,000.

It is not necessary that we grope our way through the convolutions of the Act, the regulations and the manual used by the Medicare witness, in an effort to settle the differences over the finality of Blue Cross' determination and the immediacy with which payment was due. Even if Medfield's contentions are correct, it did not give sufficient information concerning the overpayment controversy as it then existed. Its contentions do, however, relate to the remedy. When the court-ordered, but now postponed, election of directors is scheduled, proxy materials are to be submitted to the district court. That court can see to it that the materials properly vindicate the interest that there be an affirmative acknowledgment that misstatements and omissions were made and the interest that there be corrections in realistic terms. To facilitate

---

**2.** If the total liability asserted by Blue Cross were sustained, Medfield would have had a negative cash flow for five years.

**3.** The district court applied the test of materiality contained in *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 384, 90 S.Ct. 616, 621, 24 L.Ed.2d 593, 602 (1970) which provides that a fact is

material if it ". . . might have been considered important by a reasonable shareholder who was in the process of deciding how to vote." While the *Mills* test may, in certain cases, be more advantageous to plaintiffs than the *TSC Industries* test, the omissions here are material under either test.

this pragmatic approach we vacate the findings that $1,836,272 was "due and owing" on January 15, 1974, and "due within thirty days."

## II.  Management turnover

Medfield did not reveal in its proxy material that between January 23, 1973, and February 4, 1974, a number of high-level management changes occurred in the company, that its president intended to resign, and that it had been seeking for six months to employ someone to operate the company on a day-to-day basis.  The district court found that the failure to disclose these matters violated § 14(a).

■ Medfield's response, that the stockholders learned of the actual changes in personnel from the materials distributed by the Shareholders Committee, is unavailing.  While a proxy is not normally required to contain matter contained in other materials which are furnished and which are clearly referred to in the proxy, a company soliciting proxies may not obviate violation of the disclosure requirements by referring to materials furnished by its opponents in a proxy contest.  *Kohn v. American Metal Climax, Inc.*, 458 F.2d 255, 265 (CA3), *cert. denied* 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972).[4]

## III.  Disclosure of stock purchases

During 1973 Medfield's nominees purchased an aggregate of 34,972 shares of Medfield common stock.  Proxy Rule 14a.3(a), 17 C.F.R. § 240.14a–3(a), requires, in an election contest subject to Rule 14a–11, that certain information from Schedule 14B be included in the solicitation.  Schedule 14A, 17 C.F.R. § 240.14a–101, Item 4(b).  Schedule 14B requires a list of the purchases and sales of Medfield stock made within the past two years, the dates on which they were purchased or sold and the amount.  17 C.F.R. § 240.14a–102, Item 3(c).  The purchases were not disclosed in Medfield's proxy material.

■ The district court found that Rule 14a–3 was thus violated, and further, that these nondisclosures also violated Rule 14a–9.  Medfield concedes the 14a–3 violation, but contends that 14a–9 was not violated because the purchases were not material.  While the district court made no finding on materiality we think that there was a substantial likelihood that knowledge of these purchases "would have assumed actual significance in the deliberations of the reasonable shareholder."  *TSC Industries, Inc. v. Northway, Inc., supra,* —— U.S. at ——, 96 S.Ct. at 2133, 48 L.Ed.2d at 766.  Although the total number of shares purchased by the nominees in 1973 represented only 4.9% of the voting stock, the great majority of those shares were purchased by a single nominee, the president of Medfield.  A shareholder, being advised of this fact, might believe that this officer-nominee was attempting to acquire a degree of influence or control.  Appellants, in their brief, concede that the disclosure of the purchases "would have a tendency to affect a reasonable shareholder in determining how to vote," but argue that "it is highly unlikely that this knowledge would have influenced any reasonable shareholder to vote against the management slate."  Materiality does not depend on which way the information is likely to influence the shareholders to vote; rather it depends on whether the information is likely to influence the *decision* to vote.

## IV.  Disclosure of self-dealing

■ The district court found a material omission in Medfield's failure to disclose full details of an arrangement whereby a professional corporation, partially owned by a Medfield director and nominee, provided all laboratory, pathology and diagnostic services for Medfield.  The contract between the professional corporation and Medfield was described in Medfield's proxy statement as follows:

> Dr. Edward N. Willey is a stockholder of a professional association (Mateeff, Miller

4.  Moreover, the Committee's materials did not include the fact of the impending resignation of Medfield's president, nor was it generally known until it was revealed at the annual meeting.

and Willey, M.D.'s, P.A.) which is under a contractual agreement with the Company, which terminates on January 13, 1975, to provide all laboratory, pathology and diagnostic services for the Company's facilities. Dr. Willey owns 33⅓% of the stock of the professional association. The association is obligated to provide these services on a 24-hour basis and has done so since 1966. This professional association received aggregate remuneration of $261,914 for providing such services during the last fiscal year.

The following facts concerning this contractual arrangement were not revealed to the shareholders:

1) In return for its services, the professional corporation was guaranteed $208,500 per year.

2) Medfield provided the group with all necessary expendable and non-expendable equipment, supplies, furniture and fixtures, offices and laboratories, and all technologists, technical aides, secretaries, clerks and other non-medical employees.

3) Medfield was responsible for maintenance and utilities.

4) The members of the professional corporation were further permitted to engage in outside consultation and teaching.

We agree with the district court that neither the true extent of the economic benefit conferred on Dr. Willey nor its concomitant cost to the corporation was fully disclosed.

## V. Disclosure of the sale of major assets

Medfield did not reveal in its proxy materials that it had been attempting to sell two nursing homes. In fact the materials stated that Medfield was hopeful that the profitability of these two major facilities would increase.

Medfield urges that these attempts to sell need not be disclosed because neither the proxy rules nor Florida law requires shareholder approval of the sale of these facilities. This misses the issue, which is not stockholder consent to a sale but disclosure of matters important to stockholders in voting at the annual meeting.

## VI. Impugning the character of a Committee nominee

Medfield disseminated a letter pointing out the involvement of a Committee nominee in an unrelated patent infringement suit. The letter quoted from a lower court opinion that described the person as having infringed upon the patent of another. The case had been reversed on appeal and eventually settled. The settlement expressly avoided an admission of liability.

The district court found that the reference in the letter implied that the nominee was of bad moral character because he was a patent infringer. We affirm this point on reasoning contained in the opinion of the district court. CCH Fed.Sec.L.Rep. ¶ 95,013 at 97,543 (M.D.Fla.1975).

As modified, we AFFIRM.