Marshall I. KASS et al., Plaintiffs,

v.

ARDEN–MAYFAIR, INC., a Delaware Corporation, et al., Defendants.

Curtis H. PALMER and Frederick A. Schnell, Counterclaimants,

v.

LOUART CORPORATION et al., Counterclaim-Defendants.

No. CV 76–1859–DWW.

United States District Court, C. D. California.

Feb. 18, 1977.

---

James F. Crafts, Jr., James R. Madison, Robert P. Feyer, Orrick, Herrington, Rowley & Sutcliffe, San Francisco, Cal., William Falkenhainer, Chase, Rotchford, Drukker & Bogust, Los Angeles, Cal., for plaintiffs.

Daniel A. Weber, Russell J. Frackman, Alan B. Pick, Mitchell, Silberberg & Knupp,

**1040**

Jacob Swartz, Dryden, Harrington & Swartz, Gibson, Dunn & Crutcher, Don Howarth, James S. Russell, Los Angeles, Cal., George Baltaxe, Baltaxe, Rutkin, Kaplan & Klein, Beverly Hills, Cal., Melvyn H. Wald, Munger, Tolles & Rickershauser, Spray, Gould & Bowers, L. Raymond Millard, Barbara A. Lane, Los Angeles, Cal., for defendants.

## ORDER DENYING PRELIMINARY INJUNCTION

DAVID W. WILLIAMS, District Judge.

This lawsuit arose out of a proxy contest involving the election of five persons to the Board of Directors of the corporate defendant Arden-Mayfair Co., a publicly-held corporation engaged in operating dairy facilities and a chain of supermarkets. The common shareholders were to select three Board members, each to serve three-year terms, while the preferred shareholders would elect two Directors to one-year terms. The plaintiffs alleged that Arden-Mayfair's proxy materials contained misstatements and omissions which were false and misleading with respect to facts material to the proxy contest.

The plaintiffs are the Louart Corporation, which owns in excess of 10% of the common and 3% of the preferred stock of Arden-Mayfair, and two of its associates. Marshall Kass, the president of Louart and one of the plaintiffs in this action, decided to head a slate of five nominees to oppose the five incumbent nominees at Arden-Mayfair's 1976 annual meeting when his offer to serve as the Company's Chief Executive Officer was turned down. On March 19, 1976, in preparation for its April 20th annual meeting, Arden-Mayfair prepared and shortly thereafter sent to shareholders the initial management proxy statement. Additional proxy solicitation material was sent on April 12. The Louart nominees sent their proxy solicitations on April 1.

At the annual meeting the slate nominated by the existing directors received 72% of the common shares and 70% of the preferred shares voted. As a result, all five of the incumbent nominees were elected while each of the challengers was defeated.

The plaintiffs sued, alleging multiple instances of material misstatements and omissions in Arden-Mayfair's proxy material in violation of section 14(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78n, and the applicable proxy rules adopted pursuant thereto.[1] The plaintiffs move this court for a preliminary injunction to void the election results and to prevent the elected nominees from continuing to serve on the Board. The plaintiffs maintain that they are entitled to preliminary injunctive relief because Arden-Mayfair's proxy materials allegedly:

1) failed to disclose earnings losses incurred during January and February of 1976;

2) failed to disclose pending negotiations to dispose of the Company's Southern California dairy facilities;

3) failed to make complete disclosures concerning Directors' shareholdings in the Company;

4) unlawfully impugned the character, integrity and personal reputations of the Louart nominees;

5) failed to make full and accurate disclosures concerning the incumbent nominees;

6) were in violation of the proxy rules because a letter sent to the shareholders by the Chairman of the Board was not filed with the SEC;

7) failed to disclose that the retiring Chief Executive Officer was awarded a $30,000 consulting fee; and

8) failed to promptly meet plaintiffs' request for a list of the brokers and nominees who held 750,000 beneficially-owned shares of Arden-Mayfair.

The court concludes that while certain of these allegations may prove substantial upon a trial on the merits, this case is

---

1. SEC rules 14a–3, 14a–6, 14a–7, 14a–9, 14a–11; 17 C.F.R. 240.14a–3, 240.14a–6, 240.14a–7, 240.14a–9, 240.14a–11.

not an appropriate one for preliminary injunctive relief.

## I. Preliminary Injunction: Legal Test

■ The courts apply a four-pronged test to determine whether preliminary injunctive relief is proper in a particular case. First, plaintiff must show that he will suffer "irreparable injury" while the action is pending if he is not granted preliminary relief prior to an adjudication on the merits. Second, the plaintiff must demonstrate that he is likely to prevail on the merits. Third, it must be shown that as between plaintiff and defendant it is the former who will suffer the "balance of hardships" if preliminary relief is denied. Finally, the public interest is also a factor to be considered. *See, e. g.,* 7 *Moore's Federal Practice* 2d § 65.04, pp. 65–39—65–47.

■ It is clear that a mere listing of these guiding considerations demonstrates their intangible nature, especially since no attempt is made at this stage to decide finally the questions raised. The record establishes that prior to the election the plaintiffs were aware of many of the purported proxy violations allegedly committed by the defendants, but took no action to delay the election. A court of equity is less favorably disposed to grant mandatory rather than prohibitory equitable relief. *Exhibitors Poster Exch. v. National Screen Serv. Corp.,* 441 F.2d 560, 561 (5th Cir., 1971); *Miami Beach Federal Sav. & Loan Ass'n v. Callander,* 256 F.2d 410, 415 (5th Cir., 1958). Hence, the plaintiffs must carry a high burden of proof to persuade the court of its entitlement to the requested preliminary remedy.

## II. Irreparable Injury and the Balance of Hardship

If the harm the plaintiffs will suffer if this court denies their request for a preliminary injunction is compared with the harm the defendants will incur if such relief is granted, it becomes clear that it would be premature for this court to grant any relief prior to an adjudication on the merits. First, the record does not indicate that the plaintiffs will suffer irreparable injury if they are denied preliminary injunctive relief. The plaintiffs urge the court to grant a preliminary injunction in order to prevent the defendants from "consolidating their position." However, as a result of plaintiffs' delay in seeking legal redress, it has been almost ten months since the disputed proxy contest took place. It is now too late in the game for plaintiffs to complain that the defendants' position will become entrenched if this court does not issue the requested preliminary relief. In addition, it has neither been shown nor alleged that plaintiffs will suffer irreversible damage if the incumbent nominees remain on the Board at least until the conclusion of this lawsuit.[2] I fail to find that the plaintiffs will suffer irreparable injury if they are denied preliminary injunctive relief.

■ Second, where the granting of a preliminary injunction would give to a plaintiff all the actual advantage which he could obtain as a result of a final adjudication of the controversy in his favor, a motion for a preliminary injunction ordinarily should be denied. *Selchow & Righter Co. v. Western Printing & Lithographing Co.,* 112 F.2d 430, 431 (7th Cir., 1940). In the instant action, the principal thrust of the plaintiffs' lawsuit is to void the results of the proxy contest. If this court were to grant plaintiffs' preliminary motion to enjoin the elected nominees from continuing to serve on Arden-Mayfair's Board of Directors, the plaintiffs would receive the relief they seek prior to affording the defendants a trial on the merits. In addition, the issuance of a preliminary injunction now would undoubtedly come to the attention of all stockholders. No matter how clearly it was indicated that the issuance was in no way an adjudication on the merits, it would be inevitable that at least a substantial number of stockholders would reach the conclusion

---

**2.** The terms of the two Directors elected by the preferred shareholders will expire within a few months.

that such a holding was tantamount to final determination of wrongdoing on the part of management. *Kauder v. United Board & Carton Corporation*, 199 F.Supp. 420, 423 (S.D.N.Y., 1961). Thus, not only will the plaintiffs not suffer irreparable injury if their motion for a preliminary injunction is denied, but also the interests of the defendants will be severely prejudiced if this court grants the requested preliminary relief.

### III. Likelihood of Prevailing On the Merits

#### A. Alleged Rule 14a–9 Violations

■ Rule 14a–9(a) of the Proxy Regulations (17 C.F.R. § 240.14a–9) states that "No solicitation subject to this regulation shall be made . . . which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . " A misstatement or omission is material under Rule 14a–9 "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757, 766 (1976). While this test does not require proof that the outcome of the proxy contest would have been different had the defendants obeyed the proxy rules (*Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 385, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970)), it must be shown that the alleged defect was a *material* one (i. e., substantial likelihood of significance). The plaintiffs allege that the defendants committed six separate material violations of Rule 14a–9 in the course of the proxy contest, each of which allegedly invalidates the defendants' proxy solicitations and justifies a new election.

#### 1: Failure to Disclose Earnings

The plaintiffs state that in the past the practice of defendant corporation was to hold the annual meeting in late May or June so that the shareholders would receive that year's first-quarter results prior to the meeting. However, early in 1976 the Board amended the Company's by-laws so that the meeting could be held in April. As a result, the first-quarter results were not available during the course of the proxy contest. The plaintiffs allege that the defendants deliberately moved up the annual meeting so that the first-quarter results would not be available prior to the election. Further, the plaintiffs charge that at the time of defendants' April 12 proxy solicitation they knew of, but failed to mention the "disastrous results" the Company was experiencing (losses of over $1,400,000 during January and February of 1976). The plaintiffs claim that since the essence of their proxy challenge was the incumbents' allegedly dismal record in operating the Company, the failure of the defendants to mention the recent losses of the Company constituted a false and misleading omission from their proxy solicitation.

The defendants answer that the Company has never issued financial statements for a lesser period than a full quarter. The defendants contend that the omission was not misleading since they had not promised their shareholders an immediate return to profitability in the 1975 annual report, but rather had stated that they might be in the "black" by the second half of the year (1976). Further, the defendants note that they did not contradict the statement made in the plaintiffs' solicitation that the Company's recent losses were continuing and might even be increasing. The defendants conclude that the financial condition of the Company was well-known, so that any additional information they might have provided for the shareholders would have added little to their knowledge of the Company's affairs.

■ It is clear that "a company soliciting proxies may not obviate violation of the disclosure requirements by referring to materials furnished by its opponents in a proxy contest." *Gladwin v. Medfield Corp.*, 540 F.2d 1266, 1270 (5th Cir., 1976). Hence, regardless of what other information might have been made available to the shareholders, it is incumbent upon management in a

proxy contest "to supply the shareholders with all significant financial information within their possession and control." *Gladwin v. Medfield Corp.*, [1974–1975 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,013, aff'd, 540 F.2d 1266 (5th Cir., 1976). In *Gladwin* the court found that "the unaudited, preliminary result of 6 cents per share over a six month period immediately following the audited result of 8 cents per share over an entire fiscal year is not of such significance as to require a conclusion of illegality when not disclosed in proxy materials . . . ." *Gladwin v. Medfield Corp., supra*, [1974–1975 Transfer Binder] Fed.Sec. L.Rep. (CCH) at 97,536.

In the instant matter, the Company incurred losses of $1,400,000 during the first eight weeks of 1976, compared with a $600,000 loss for the same period in 1975. As in *Gladwin*, the more recent unaudited figure was available to management prior to the mailing of their proxy solicitation. However, while in *Gladwin* the Company's unreported performance had dropped only 25% from the prior reported period, in the instant matter Arden-Mayfair's unreported losses had increased by over 100% when compared with the same period of the previous year. The omission of these poor earnings results from defendants' proxy materials may be of such significance as to require a conclusion of illegality, especially since the first quarter results were unavailable as a result of the Board's decision to hold the annual meeting earlier in the year than was customary. At trial the defendants will have to carry a heavy burden to satisfy the court that the unreported losses, if divulged to the shareholders, would not have had a significant likelihood of being important in their voting decision.

### 2. Failure to Disclose the Knudsen Transaction

The defendants failed to disclose that they were negotiating to divest the Company of all of its dairy facilities in Southern California through a long-term lease to the Knudsen Company. This transaction was consummated just prior to and first announced to the shareholders on the day of the election. The plaintiffs claim that the defendants' failure to disclose that they were engaged in negotiations to dispose of these dairy facilities was a material omission from defendants' proxy materials, for it was information which purportedly would raise significant questions for shareholders about management's long-term objectives.

The defendants answer that the Knudsen negotiations were an on-and-off proposition for a long time. They maintain that up until the deal was consummated it was still "up in the air" so that at the time of their April 12 proxy solicitation there was not even a "reasonable probability" that the deal would go through. The defendants conclude that it would have been improper for them to disclose pending negotiations, for if the deal did not materialize, the defendants claim that they would have been vulnerable to a charge that they wrongfully won votes on the basis of a premature announcement of the Knudsen transaction. In any event, the defendants point out that they were under no duty imposed by the SEC regulations to disclose the negotiations.

The purpose of the proxy regulations is to command disclosure of matters important to stockholders in voting at the annual meeting. *Gladwin v. Medfield Corp., supra*, 540 F.2d at 1271. The defendant corporation in *Gladwin* was in the business of managing various health facilities. The court stated that the possible sale of two of the corporation's major assets (two nursing homes) required disclosure in the defendants' proxy solicitation materials. *Gladwin v. Medfield Corp., supra*, [1974–1975 Transfer Binder] Fed.Sec.L.Rptr. (CCH) at 97,541. The court in *Gladwin* found it important that prior to the disposition of these assets the defendant had stated in its proxy materials that it was hopeful that their profitability would increase. The court concluded that the failure to disclose management's intention to dispose these assets violated section 14a.

In the instant matter Arden-Mayfair's Southern California dairy facilities were

important Company assets, which, according to plaintiffs, accounted for from $50,-000,000 to $60,000,000 in annual sales. Such facilities would appear to be important enough that a disclosure that serious negotiations were underway for their disposal would be of interest to shareholders. The plaintiffs charge that during the proxy contest both sides had pledged their opposition to liquidating the Company. The plaintiffs may be able to show at trial that the disposal of the Southern California dairy facilities was a significant departure from prior representations of defendants, such that serious negotiations to that end should have been disclosed. On the other hand, the defendants may be able to show that the non-disclosure of these negotiations was not a material omission from their proxy materials and that premature disclosure would have been potentially unsettling to sensitive negotiations.

### 3. Incomplete Disclosures Concerning Directors Shareholdings

Schedule 14B of the Proxy Regulations (17 C.F.R. § 240.14a–102) requires, *inter alia*, that all "participants" in a proxy contest (the nominees and those actively participating in their campaign) disclose in the proxy materials all purchases and sales they made of the Company's securities within the preceding two years. The plaintiffs allege that the defendants failed to observe this disclosure requirement with respect to several participants. First, it was not disclosed that Mr. Mathewson, who retired as Chairman of the Board and Chief Executive Officer of the Company in 1975, sold, while he was in office, 20,000 shares of Arden-Mayfair's common stock, which amounted to approximately one-seventh of his total holdings at the time. The defendants respond that while they requested the directors to file such information with the SEC, as the Regulations require, a few failed to do so, so that the defendants were not able to include in their proxy materials information concerning the shareholdings of a few of the Directors.

Second, plaintiffs assert that the defendants also violated Schedule 14B by neglecting to provide information to the shareholders concerning the directors' holdings and recent transactions in Arden-Mayfair debentures. The plaintiffs suggest that one of the Directors (Mathewson) was selling the Company's equity securities and buying its more secure debentures.

■ The non-disclosure of dealings in the Company's securities by an officer is grounds for finding a material violation of the proxy regulations. *Gladwin v. Medfield Corp., supra*, 540 F.2d at 1270. However, every such non-disclosure will not merit a finding of illegality. Courts will examine the proportion of the Company's outstanding shares involved and the degree of concentration of the non-disclosed transactions in a particular Director in evaluating charges of proxy violation. *Gladwin v. Medfield Corp., supra*, 540 F.2d at 1270. In addition, where a participant does not cooperate with a slate of nominees in making filings required by the proxy regulations, the slate will not be regarded as negligent in having failed to uncover and disclose the required information. *Chris-Craft Industries, Inc. v. Independent Stock. Com.*, 354 F.Supp. 895, 915 (1973). Thus, it will be up to the plaintiffs to establish at trial that the non-disclosed transactions were both material and reasonably discoverable by defendants during the proxy contest.

■ Finally, the plaintiffs assert that the failure of defendant Briskin to disclose that he had pledged much of his Arden-Mayfair stock to a bank as security for a loan constituted a material omission from the defendants' proxy materials. While item 3(e) of Schedule 14B requires participants to disclose any deals "with respect to any securities of the issuer, including . . . loan or option arrangements," it does not appear that the mere pledge of stock as security for a loan is covered. *See Chris Craft Industries, Inc. v. Independent Stock Com., supra*, 354 F.Supp. at 911.

### 4. False and Misleading Statements Concerning The Louart Nominees

Plaintiffs allege that the defendants' proxy materials unlawfully impugned the

character, integrity and personal reputations of the Louart nominees. The plaintiffs complain that the defendants wrongfully attacked the ability and intentions of the Louart nominees in discussing a lawsuit brought against Louart Corporation. In *Bosche v. Louart Corporation*, No. 45485 N.D.Cal., settlement approved February 20, 1975), Louart and its management were sued for alleged securities fraud violations in connection with the liquidation of one of Louart's subsidiaries. The action was ultimately settled for $165,000 ($120,000 of which was for attorneys fees and costs). The plaintiffs complain of several alleged misstatements by defendants concerning that action. First, plaintiffs state that the defendants erroneously asserted that Marshall Kass and his family controlled the Board of the subject subsidiary, which had voted for its liquidation. The implication by Arden-Mayfair's management was that if the Louart nominees gained control of Arden-Mayfair the Company would suffer the same fate as the subject subsidiary in *Bosche*—liquidation. However, at the time of the *Bosche* action, only three of the nine Board positions were held by the Kass family (one family Board member had recently died.)

Second, the plaintiffs complain about the defendants' description of the settlement of the *Bosche* action (as quoted from the settlement papers) as "$.65 per share plus $120,000 for the plaintiffs' attorneys' fees." The plaintiffs claim that the defendants should have disclosed that the $.65 per share amounted to less than $50,000, purportedly a "very favorable settlement for a major securities fraud action." The plaintiffs assert that without such an explanation most shareholders would be justified in assuming that the settlement of a lawsuit involved a payment to the plaintiffs of several times as much money as the attorneys received.

In addition to their displeasure with the defendants' discussion of the *Bosche* action, the plaintiffs complain that the defendants' proxy materials implied that the Louart nominees intended to liquidate Arden-Mayfair and alleged that Marshall Kass was unsuited to serve in the position of Chief Executive Officer of Arden-Mayfair. The plaintiffs assert that both of these points were materially false and misleading.

In light of the fact that proxy contests are adversary proceedings, it is inevitable that each side will find some fault with what is said about itself by the opponents. The absence of complete candor and the presence of some "puffing" will not necessarily render a proxy contest invalid. *Sec. & Exch. Comm'n. v. May*, 134 F.Supp. 247, (SD N.Y., 1955), aff'd 229 F.2d 123 (2d Cir., 1956); *Rosen v. Alleghany*, 133 F.Supp. 858 (SD N.Y., 1955). However, the permissible latitude is limited, since a non-disclosed fact or a "puffed-up" accusation may constitute the presentation of an untrue statement. *Sec. & Exch. Comm'n. v. Macon*, 28 F.Supp. 127 (D.Colo., 1939); *Rosen v. Alleghany Corp., supra*, 133 F.Supp. 858. In the instant matter, the defendants concede that they mistakenly asserted that the Kass's controlled a majority of the Board of the Louart subsidiary. In addition, the defendants did appear to have access to more information than they disclosed to the shareholders concerning the settlement of the *Bosche* action. However, absent a persuasive showing of materiality by the plaintiffs at trial, this court will be inclined to find a lack of materiality in these and other complaints the plaintiffs have made concerning the defendants' discussion of the Louart nominees.

5. Statements Concerning Arden-Mayfair's Management

Plaintiffs charge that defendants' proxy materials omitted and misstated several material facts concerning management's nominees. First, the plaintiffs state that the defendants failed to disclose that one of their nominees, Mr. Shapiro, was disciplined by the SEC in 1970 for alleged violations of the securities laws, and had agreed never again to become associated with a broker-dealer. While conceding that the SEC Proxy Regulations do not require such disclosures, the plaintiffs maintain that since

the defendants made much of the *Bosche* action, they should have also disclosed Mr. Shapiro's past problems with the SEC.

■ There is authority for the proposition that where a nominee's background is likely to adversely affect a profitable company asset, such background should be disclosed to the shareholders. *Chris-Craft Industries, Inc. v. Independent Stock Com.,* supra, 354 F.Supp. at 895. However, this is not plaintiffs' position. While the proxy rules are designed to ensure disclosure of matters important to stockholders in voting at the annual meeting (*Gladwin v. Medfield Corp.,* supra, 540 F.2d at 1271), this does not mean that each side of a proxy contest must make the strongest case possible against its nominees. The plaintiffs, who make no claim that they were not aware of Mr. Shapiro's past problems with the SEC, were free to comment on his qualifications or disabilities.

The plaintiffs also complain that the defendants did not disclose that Bernard Briskin had become the "de facto Chief Executive Officer" of Arden-Mayfair through his position as Chairman of the Executive Committee. The plaintiffs assert that the Company's Chairman of the Board, Mr. Palmer, is merely a part-time "front man" with no operational responsibility. The defendants categorically deny these charges.

Item 6(a)(1) of Schedule 14A of the Proxy Regulations (17 C.F.R. § 240.14a–101) requires that the proxy materials disclose "all other positions and offices with [the corporation], presently held by [a director]." Where a position carries a corporate salary, the Proxy Rules require that it be disclosed to the shareholders. *Dillon v. Berg,* 326 F.Supp. 1214, 1232 (D.Del., 1971). In the instant action, the defendants do not dispute plaintiffs' claim that they failed to disclose Mr. Briskin's position as Chairman of the Executive Committee. If this position carried a corporate salary, its non-disclosure may constitute a material violation of the Proxy Rules. It will be up to the plaintiffs to make such a showing at trial.

■ The plaintiffs make various other allegations of nondisclosure by the incumbent slate which, when summarized, boil down to the proposition that the defendants were very free to make charges against the Louart nominees which called into question their qualifications and capabilities, but they were not nearly so forthcoming in admitting allegedly identical shortcomings in their own slate of nominees. While the Proxy Rules encourage candid disclosure during the course of a proxy contest, as was stated above, it is both expected and permissible for one side to argue most fervently against the other side rather than against its own nominees. The fact that this posture may have been taken by the defendants does not alone constitute a violation of the Proxy Regulations.

**6. The February 12 Letter**

■ The plaintiffs argue that a letter sent to the shareholders by Mr. Palmer, who a month earlier had been elected Chairman of the Board, should have been filed with the SEC as proxy material. In addition, the plaintiffs allege that in any event, this letter was mere one-sided propaganda which had no place in a proxy campaign. The letter in question was mailed on February 12, 1976, more than two months before the election. The defendants explain that the letter was sent in order for Palmer to "introduce" himself to the shareholders and to present some recent steps taken by the Company.

A letter which does not request the giving of any proxy authorization is still subject to the Proxy Rules if it is part of "a continuous plan intended to end in solicitation and to prepare the way for a successful campaign." *Studebaker Corporation v. Gittlin,* 360 F.2d 692, 696 (2d Cir., 1966); *SEC v. Okin,* 132 F.2d 784, 786 (2d Cir., 1943). Louart Corporation did not initiate the proxy contest until over a month after the February 12th letter was sent. The record does not indicate that the defendants sent the subject letter as part of a continuing plan to solicit proxies. Rather, this letter appears to have been sent pursuant to management's policy to stay in touch with the shareholders.

## B. Other Alleged Proxy Violations

The plaintiffs argue that the "materiality" requirement should be limited to § 14a–9 violations, so that as to other alleged violations of the Proxy Regulations the plaintiffs would not need to establish a "sufficient causal relationship" between the violation and the purported injury in order to gain relief. However, plaintiffs' position is not well taken. Regardless of which proxy regulation is alleged to have been violated, in order to establish illegality, a plaintiff must show "that the Proxy Statement, as sent to the stockholders was so false or misleading as to require the . . . court to enjoin the voting of proxies or . . . to annul the vote taken at the meeting and order a new one." *Ronenblatt v. Northwest Airlines, Inc.,* 435 F.2d 1121, 1125 (2d Cir., 1970). Hence, regardless of which proxy rule the plaintiffs allege has been violated, such violation must still satisfy the materiality requirement if the plaintiffs are to be entitled to relief.

### 1. Mathewson's Consulting Fee

Director Mathewson resigned from the Board and his position as its Chairman at the end of 1975. The Board of Directors voted to pay Mathewson $5,000 per month for a minimum of six months starting January, 1976, as a consultant. Item 7(c) of Schedule 14A requires disclosure of all remuneration proposed to be paid to each director or officer who received more than $40,000 in the previous fiscal year (17 C.F.R. § 240.14a–101). While Mathewson received compensation of $100,000 from Arden-Mayfair in 1975, his consulting fee was not disclosed in Arden-Mayfair's proxy materials.

The defendants answer that in response to a questionnaire they had sent to Mathewson, he had failed to list this fee, which caused the defendants to omit same from their proxy statements. The defendants claim this omission was not material, since resigning executives commonly enter into such consulting arrangements, and the size of the fee was not immoderate.

The failure to disclose proposed remuneration covered by Item 7(c) of Schedule 14A has been held to constitute a violation of Proxy Rule 14a–3. *Dillon v. Berg, supra,* 326 F.Supp. at 1232. The court will be interested to hear arguments concerning the materiality of this omission at trial.

### 2. Failure to Provide List of Beneficial Owners

The plaintiffs complain that although the defendants provided plaintiffs with a list of Arden-Mayfair shareholders, this list did not disclose the number of beneficial owners represented by brokers, nominees or trustees. On April 5, 1976, the plaintiffs requested a "broker list" from defendants, which would give plaintiffs the information they sought concerning the beneficially-owned shares. The defendants provided plaintiffs with this list ten days later, which was five days before the election. The plaintiffs claim that defendants' response can in no way be deemed acceptable in view of Rule 14a–7 (which states that such information as requested by plaintiffs shall be furnished "promptly") and the clear urgency of plaintiffs' request.

The defendants respond that they had to put forth considerable effort to gather the requested information, and they satisfactorily explain the slight delay in furnishing a list of those responsible for over ¾ of a million beneficially-owned shares. If this list was of such great importance to the plaintiffs they should not have waited until two weeks before the election to formally request it from the defendants.

## IV. Conclusion

The granting of injunctive relief is highly discretionary. *SEC v. Computronic Industries Corp.,* 294 F.Supp. 1136, 1138 (ND Tex., 1968). The reluctance to exercise this drastic power should be especially great where temporary relief is sought. *Kauder v. United Board & Carton Corp.,* 199 F.Supp. 420, 423 (SD N.Y., 1961). The case at bar is not a proper action in which to grant preliminary injunctive relief. To grant a preliminary injunction in this mat-

ter would give to the plaintiffs most, if not all, of what they could hope to achieve upon a successful adjudication on the merits. In addition, it is not clear that the plaintiffs will suffer irreparable injury if preliminary relief is not granted pending a trial on the merits.

On the other hand, one or more of plaintiffs' allegations may prove substantial upon a trial of this action. In particular, three arguments are of special interest to the court. First, the defendants' failure to disclose Arden-Mayfair's most recent losses just prior to the election may constitute an omission of material information which likely would have been important in the shareholders' voting decision. Second, if the plaintiffs can demonstrate that the defendants had pledged to the shareholders their intention to avoid liquidating the company, then the defendants should have disclosed the on-going negotiations with Knudsen. Finally, plaintiffs are encouraged to produce more information concerning the unreported dealings of certain Directors in Arden-Mayfair's stock.

The motion for a preliminary injunction is denied.