**JUSTIN INDUSTRIES, INC.**

v.

**CHOCTAW SECURITIES, L.P., et al.**

v.

**JUSTIN INDUSTRIES, INC., et al.**

**Civ. A. No. 4–90–379–K.**

United States District Court,
N.D. Texas,
Fort Worth Division.

Oct. 1, 1990.

Edmund Glen Johnson, Marianne Marsh Auld, Kelly Hart & Hallman, Fort Worth, Tex., for plaintiff.

James Allen Cox, Rod Phelan, Baker & Botts, Dallas, Tex., for defendants.

### MEMORANDUM OPINION

BELEW, District Judge.

Pending before the Court is Counterclaimants' Motion for an Order Requiring Justin to Hold an Annual Shareholders Meeting for the Election of Directors. After careful consideration of the extensive briefs and affidavits filed, the oral arguments of counsel, and the applicable law, the Court is of the opinion that the Motion is not well taken and should be denied.

## I. BACKGROUND

The following facts are undisputed. Plaintiff and Counterdefendant Justin Industries, Inc. ("Justin") is a publicly held corporation organized under the laws of the State of Texas with its principal place of business in Fort Worth, Texas. Justin's 8.5 million shares of common stock outstanding are listed and traded on the National Market System of the National Association of Security Dealers Automated Quotation System (NASDAQ). Company president and Chairman of the Board John Justin owns roughly 20% of the outstanding stock.

Defendant and Counterclaimant Choctaw Securities ("Choctaw") is a Limited Partnership, organized under the laws of the State of Missouri, owning roughly 12% of Justin's common stock. The Choctaw partnership is headed by two investors, Barry Rosenstein and Perry Sutherland, with Sutherland playing the larger role in these proceedings.

Choctaw began to acquire Justin stock in July of 1989, when the stock was trading at $10.50 per share. For the two years prior to Choctaw's purchases, Justin's stock price averaged $9.76 per share and never traded as high as $12 per share. The stock had ranged in price between $7⅞ and $11⅛ in 1988, and between $6⅝ and $11⅞ in 1987.[1] In late 1989 the price reached $16 a share.

On March 7, 1990, Choctaw and Sutherland made a conditional offer to the Justin Board of Directors to acquire all of Justin's outstanding stock for cash at $18.50 per share. The offer was conditioned upon Choctaw acquiring the necessary financing to consummate the transaction. The Board responded by rejecting the offer and filing suit in May of this year. Justin's suit alleged that Choctaw had violated section 13(d) of the Securities and Exchange Act of 1934 ("Exchange Act") by failing to disclose its intentions in Schedule 13D filings which are required to be made by persons acquiring more than 5% of a publicly held company. Choctaw counterclaimed, asserting various causes of action, including preliminary and permanent injunctive relief, as well as a claim for $25 million in punitive damages.

In his counterclaim, Sutherland maintains that the Justin Board of Directors ("Directors") defrauded its shareholders in soliciting their proxies for the March 1990 annual election of directors by failing to disclose a bylaw amendment dated November 1989. The amendment changed the vote necessary to remove directors to require an "affirmative vote of the holders of 75% of the outstanding stock."

In September of this year, the Justin Board amended the bylaw a second time, reverting to the text of the original bylaw.[2] Justin acknowledges that the bylaw amendment should have been disclosed in a 10K filed with the Securities and Exchange Commission ("SEC") back in 1989 and produced affidavits to show that the matter was simply overlooked until it was disclosed to the shareholders in August of this year. In contrast, Justin does not concede that the amended bylaw should have been disclosed in the proxy statements used to solicit shareholders, but rather, maintains that the information was not material and, therefore, need not be disclosed.

Choctaw and Sutherland further allege that, in addition to the bylaw amendments, Justin management has committed several acts of entrenchment in order to insulate them from attack by takeover artists. Among them are (1) adoption of a "poison pill" (a.k.a. shareholder's rights plan), (2) the adoption and passing out of "golden parachutes" (a.k.a. management severance contracts), and (3) the proposed acquisition of the Tony Lama Company (now officially consummated on 9/26/90), which Choctaw claims is a defensive maneuver in keeping with the "scorched earth" or "make yourself ugly" defense to a hostile takeover.

---

1. These figures are adjusted to reflect a 3–for–2 stock split effective December 28, 1989.

2. Article II, section 1 of the Justin Bylaws provides in pertinent part: "Any director may be removed from office, with or without cause, by a majority vote of the shareholders at a meeting at which a quorum of shareholders is present."

In its second amended counterclaim, Choctaw and Sutherland ask this Court to order the Justin Directors to call a new annual meeting of shareholders to elect directors and to "maintain the status quo" pending the new election. In regard to the latter request, Choctaw has asked this Court to order the Directors to "redeem the pill" and to enjoin the Directors from amending the bylaws, performing the parachutes, proceeding with the Tony Lama acquisition, soliciting proxies absent full disclosure, or taking any steps to influence adversely the consideration by Justin's public shareholders of a tender offer by Sutherland.

## II. ANALYSIS

Counterclaimants Choctaw and Sutherland have filed with the Court a motion entitled "Motion for an Order Requiring Justin to Hold an Annual Shareholders Meeting for the Election of Directors." The relief sought by Choctaw, a new annual meeting to elect directors, is clear enough; the means to that end, however, is somewhat less than clear. It appears to the Court that Choctaw seeks the entry of a mandatory injunction compelling Justin to hold a new election, yet counsel for Choctaw parades its requested injunctive relief not as a motion for a preliminary or permanent injunction, but rather under the guise of a motion never before seen in this Court.[3]

■ Whether Sutherland chooses to entitle his motion one for preliminary or permanent injunctive relief has little bearing on our analysis, however, for both require a showing of a harm for which there is no adequate remedy at law. See Canal Authority of Florida v. Callaway, 489 F.2d 567 (5th Cir.1974) (setting forth the requirements for a preliminary injunction)[4]; Molex, Inc. v. Nolen, 759 F.2d 474, 477 (5th Cir.1985) (irreparable harm required for issuance of permanent injunction). Furthermore, since the requested injunctive relief is mandatory in nature (i.e., to compel a new election), Sutherland carries the burden of showing *clear entitlement* to the relief under the facts and the law. *Exhibitors Poster Exch. Inc. v. National Screen Serv. Corp.*, 441 F.2d 560 (5th Cir.1971) (per curiam).[5]

*Irreparable Harm and the Adequacy of Legal Remedies*

■ The essence of injunctive relief is whether there exists an adequate remedy at law. If not, preliminary or permanent injunctive relief may be available. To invoke the court's equity jurisdiction to issue an injunction, the movant must demonstrate that he is being threatened by some injury for which he has no adequate legal remedy. It is to this matter that we now turn.

Courts and commentators alike frequently confuse the term "irreparable harm" with the phrase "adequate remedy at law". Indeed, the two are often used interchangeably. Yet the Fifth Circuit has made clear that the two are distinct:

> Whereas the essential finding that must be made to issue a TRO or preliminary

**3.** In their brief filed September 21, 1990 at page 7, note 10, Choctaw's attorneys write "When the Court asked us if we wanted a hearing on our motion, we filed a formal request for hearing, stating that our motion combines preliminary and permanent relief. We put the matter that way, and styled our motion as we did, because we only need a single hearing, and the primary relief we seek—a new election—is necessarily final. Justin's claim that Sutherland has indicated that its motion 'is intended to be an application for preliminary injunctive relief' is simply untrue."

**4.** The party seeking a preliminary injunction must show (1) the inadequacy of legal remedies and the probability of irreparable harm if the

injunction does not issue, (2) a substantial likelihood of success on the merits, (3) that the threatened injury to the movant outweighs the threatened harm the injunction may do to the non-movant, and (4) that granting the preliminary injunction will not disserve the public interest. 489 F.2d at 572.

**5.** Sutherland, by seeking a mandatory injunction, carries a heavy burden. Injunctions are extraordinary remedies that are generally not favored (*See* 11 Wright & Miller, *Fed. Practice and Procedure* § 2942 (1973)), and mandatory injunctions are even less favored than prohibitory injunctions since they compel a person to act rather than simply maintain the status quo.

injunction is irreparable injury, the essential prerequisite to a permanent injunction is the unavailability of an adequate remedy at law. Irreparable injury is, however, one basis, and probably the major one, for showing the inadequacy of any legal remedy. *See* Wright & Miller, *Fed. Practice and Procedure* § 2944 at 399–401 (1973). Often times the concepts of "irreparable injury" and "no adequate remedy at law" are indistinguishable ... The irreparable injury rubric is intended to describe the quality or severity of the harm necessary to trigger equitable intervention. In contrast, the inadequate remedy test looks to the possibilities of alternative modes of relief, however serious the initial injury.

*Lewis v. S.S. Baune,* 534 F.2d 1115, 1124 (5th Cir.1976).

■ At the outset, the Court is troubled by the fact that the precise relief that Sutherland seeks, a new election of directors, is within Choctaw's powers and privileges as a 10% shareholder. Article 1, section 2 of the Bylaws provides that a ten percent shareholder may call a special election. Choctaw's ownership interest currently stands at 11.9% of the outstanding stock. Thus, Sutherland can achieve the same remedy and the same result that a court-ordered injunction would accomplish.[6] Sutherland, no doubt, would prefer to have the Court as his ally in ordering a new election, (the expectation being that such an order would send a message to shareholders that the Justin Board of Directors has acted improperly)[7] yet equity will not enjoin an act for which there exists a legal remedy.

By virtue of the bylaws, Sutherland, himself, can call for a special election of directors and can run his own slate of candidates for office. To date he has not done so. Should he choose to exercise this option and should he be successful, Sutherland and his hand-picked Board can undo all of the "entrenchment devices" allegedly put in place by the current Board. Indeed, the alleged evils of both the poison pill (which Sutherland maintains will spawn economic suicide if forced to swallow) and the golden parachutes can be avoided entirely if Sutherland should succeed. Thus, until such time as Sutherland has exhausted his legal remedies and can show irreparable harm, this Court will not intervene in the affairs of the corporation and no injunction will issue.

■ Sutherland argues next that the amended bylaw and the golden parachutes are "material" within the meaning of the SEC regulations[8] and that they were required to be disclosed to shareholders in Justin's February 20, 1990 proxy statement. Because they were not, he argues, the Directors obtained their proxies by fraud and the election results should be voided.[9] It is uncontroverted, however,

---

6. This is so because, in addition to the bylaw that provides for the calling of a special election by a 10% shareholder, the bylaw that rests at the heart of this controversy provides that directors may be removed, with or without cause, at a special election called for that purpose. (Justin Industries, Inc. Bylaws, Article II, § 1)

7. The Justin Board of Directors is a collection of some of Fort Worth's best known and most respected individuals, including the Chancellor of Texas Christian University, the president and chairman of Tandy Corporation, the chairman of Team Bank and a former mayor of Fort Worth, the chairman of Rock Bit Industries, and a name partner in one of the city's largest law firms. The implications and accusations of wrongdoing that would undoubtedly accompany a court-ordered election are factors that merit some consideration.

8. Specifically, Rule 14(a)(9) of the 1934 Exchange Act provides in pertinent part: "(a) No solicitation subject to this regulation shall be made by means of any proxy statement ... containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."

9. Sutherland argues that the current Board was not only elected illegally, but is serving illegally, an argument that is easily disposed of in light of Justin's bylaws. Article II, section 1 provides, in pertinent part: "Each director shall hold office for the term for which he is elected and until his successor shall have been elected and qualified."

that the "golden parachutes" were not approved by Justin's Board until *after* the annual shareholders meeting. Accordingly, they were not required to be disclosed in the proxy statements. This leaves only the amended bylaw.

Having found that Sutherland has an adequate remedy at law, we normally would not reach this issue. Assuming, arguendo, that Sutherland could not call for a special election himself, we now address his claims of proxy fraud.

In the context of the securities regulations, the term "material" has assumed great significance and has taken on special meaning. Indeed, much has been written to define what this one potent word means in this context. The leading case defining the materiality standard is *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). There, the Supreme Court held that an omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. *Id.* at 449, 96 S.Ct. at 2132. As Sutherland was quick to point out, this does not require a showing that a reasonable shareholder would have changed his vote, but rather, that the omitted fact would have assumed actual significance in the deliberations of shareholders. Put another way, the information must have altered the "total mix" of information made available to shareholders. *Id.*

Before the Supreme Court decided *TSC Industries*, it decided *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). In *Mills*, the high Court was careful to point out that

> [t]his requirement that the defect have a significant *propensity* to affect the voting process is found in the express terms of Rule 14a–9, and it adequately serves the purpose of ensuring that a cause of action cannot be established by proof of a defect so trivial, or so unrelated to the transaction for which approval is sought, that correction of the defect or imposi-

tion of liability would not further the interests protected by § 14(a).

*Id.* at 384, 90 S.Ct. at 621. (emphasis in original). The test for materiality reflects this desire to avoid trivial violations by requiring that there be a *substantial likelihood* that the omitted fact would have been important to a reasonable shareholder.

◼ In its brief to the Court, Justin argues that the current Board of Directors was elected by over 93% of the vote and that this should be taken as an indication that the shareholders' decision to elect the Board would not have been influenced by the added knowledge of the amended bylaw. Secondly, Justin argues that the lack of activity in the price of Justin stock after the amended bylaw was disclosed is the best indication that the omitted information would not have been significant to a reasonable shareholder. The Court finds this last argument more persuasive than the first.

While not conclusive evidence of immateriality, the absence of a significant drop in the price of Justin stock after the announcement of the amended bylaws is some indication that the shareholders were not overly concerned with the amendments. On August 24, 1990, the day the Board disclosed the bylaw amendments, the price of Justin's shares was unchanged. Three days later, the price dropped ¼, yet only 1,400 shares changed hands.[10] The following day, August 28, nearly twice as many shares changed hands and the price increased by ¾. Thus, if the stock market is any indication at all, the Justin shareholders viewed the changed bylaws to be, at best, insignificant.

In support of its requested remedy, Choctaw cites *Gladwin v. Medfield Corp.*, 540 F.2d 1266 (5th Cir.1976). In *Gladwin*, the court ordered a new election after a trial on the merits, yet the proxy statement omissions were clearly necessary in order to make what *was* disclosed not misleading. In its proxy materials Medfield stated that

---

**10.** On August 27, 1990, only 1400 shares were traded, the fifth smallest amount in the entire month of August.

it was hopeful that the profitability of two major nursing homes would increase. The company neglected to tell shareholders that at the very time it made this statement it was attempting to sell the two facilities. The court found that the omitted information was material in light of the statements that *were* disclosed. *Id.* at 1271.

Here, it is not the case that Justin told shareholders one thing when in fact the opposite was true. Rather, Justin's Board merely took protective steps to ensure that, in the event of a buyout, the shareholders would receive a fair price for their shares. We do not find the bylaw changes to be of such magnitude that shareholders, when electing directors, would have concerned themselves with the pros and cons of the changes. The average shareholder does not have enough time or interest to scrupulously monitor the affairs of each corporation in which he invests. Decisions are made, often without adequate information, let alone knowledge of the bylaws governing the corporation. It is perhaps for this reason that the SEC disclosure regulations warn of inundating shareholders with superfluous information.

Accordingly, we hold today that the bylaw amendments were not material and did not have to be disclosed to shareholders, and Sutherland thus has no basis for claiming irreparable harm. Moreover, the fact that Sutherland himself can call a new election, thereby doing what he is asking the Court to do, provides him with an adequate remedy at law. Thus, having found the absence of irreparable harm and the presence of an adequate remedy at law, the Court is of the opinion that Sutherland is not entitled to any form of injunctive relief, be it preliminary or permanent. Counterclaimant Choctaw's Motion for an Order Requiring Justin to Hold an Annual Shareholders Meeting for the Election of Directors is therefore DENIED.